958 A.2d 42

MOUNTAIN HILL, L.L.C., PLAINTIFF–APPELLANT/CROSS–RESPONDENT, v. ZONING BOARD OF ADJUSTMENT OF THE TOWNSHIP OF MIDDLETOWN, DEFENDANT–RESPONDENT/CROSS–APPELLANT (TWO CASES).

Superior Court of New Jersey
Appellate Division

Argued January 22, 2008—Decided September 10, 2008.

Before Judges STERN, COLLESTER and C.L. MINIMAN.

*Gary E. Fox*, argued the cause for appellant/cross-respondent (*Fox & Melofchik*, attorneys; Mr. Fox, on the brief).

*Gregory W. Vella*, argued the cause for respondent/cross-appellant (*Collins, Vella & Casello*, attorneys; Mr. Vella, on the brief).

The opinion of the court was delivered by

C.L. MINIMAN, J.A.D.

Plaintiff Mountain Hill, L.L.C. (Mountain Hill), appeals from a March 16, 2005, summary judgment in favor of defendant Zoning Board of Adjustment of the Township of Middletown (Zoning Board) in Mountain Hill's action in lieu of prerogative writs. The judge determined that Mountain Hill was required to obtain a use variance in order to construct driveways crossing the zone lines of its split-zoned property on Route 35 in the Township of Middletown. The judge also concluded that Mountain Hill was required to obtain a use variance in order to construct buildings straddling zone lines wherever the use to which the building would be put was not permitted in both zones. The Zoning Board cross-appeals from a summary judgment in favor of Mountain Hill determining that Mountain Hill could apply for a consolidating subdivision into one lot even though its property was split-zoned. We affirm the orders requiring a use variance for buildings straddling zone lines and permitting Mountain Hill to apply for a consolidating subdivision of its split-zoned property. We reverse the order requiring a use variance for driveways crossing the zone line of Mountain Hill's split-zoned property.

Mountain Hill also appeals from a portion of a June 20, 2005, summary judgment in another action in lieu of prerogative writs against the Zoning Board challenging its interpretation of the Planning and Development Regulations of the Township of Middletown (Development Regulations). The judge affirmed the Zoning Board's interpretation of the Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D-1 to-163, and Middletown's Develop-

ment Regulations as requiring the inclusion of parking garages in gross floor area when calculating floor-area ratio. The Zoning Board cross-appeals from a portion of that same summary judgment in which the judge reversed the Zoning Board's determination that surface-water retention ponds do not qualify as open space under its Development Regulations. We reverse the part of the order requiring inclusion of parking garages in gross floor area and affirm the part of the order permitting retention ponds to be included in open space.

## I.

These are the second and third of four appeals by Mountain Hill argued before us on January 22, 2008, all of which relate to the property on Route 35 in Middletown that Mountain Hill seeks to develop.[1] There have been two prior decisions by us that also relate to the same property. *See Mountain Hill, L.L.C. v. Middletown Twp.*, 353 *N.J.Super.* 57, 801 *A.*2d 412 (App.Div.), *certif. denied*, 175 *N.J.* 78, 812 *A.*2d 1110 (2002) (*Mountain Hill I*); *Mountain Hill, L.L.C. v. Middletown Twp.*, Nos. A–1968–01, A–2556–01 (App. Div. April 16, 2003) (*Mountain Hill II*). The first of the four appeals argued on January 22, 2008, presented an issue under the Open Public Meetings Act, *N.J.S.A.* 10:4–6 to–21, the facts of which are not particularly relevant here. *See Mountain Hill, L.L.C. v. Twp. of Middletown*, 399 *N.J.Super.* 486, 945 *A.*2d 59 (App.Div.2008) (*Mountain Hill III*). However, in *Mountain Hill III* we reviewed facts from *Mountain Hill I* and *Mountain Hill II* that provide background for this action and we incorporate them here. *Id.* at 489–91, 945 *A.*2d 59.

---

[1] A fifth appeal relating to a farmland assessment on property owned by Mountain Hill on the opposite side of Kanes Lane from this project was argued before us on April 7, 2008, and is the subject of a separate opinion. *Middletown Twp. v. Mountain Hill, L.L.C.*, No. A–5857–06, 2008 WL 2811592 (App.Div. Jul. 23, 2008).

## A.

Mountain Hill owns Lots 53–57, 59–73 and 75–81 in Block 825 and Lot 7.01 in Block 871 on the tax map of Middletown. The size of the combined lots is 137 acres. Mountain Hill submitted a conceptual plan to the Zoning Board on September 19, 2000, anticipating the need for a use variance with respect to a portion of the development project. The project had some proposed nonconforming uses in fifty-six acres of Mountain Hill's property located in the M–1 (light industry) zone, which does not permit residential uses, supermarkets or department stores. The balance of its property at the time, eighty-five acres, was located in the Planned Development (PD) zone, which permitted town centers and mixed uses.

Mountain Hill sought a bifurcated use variance to permit construction of four single-family homes and four apartments in the M–1 zone as part of the overall development project. Mountain Hill also sought a bifurcated use variance to permit a portion of a department store in the PD zone to extend into the M–1 zone. Public hearings on Mountain Hill's application were held on sixteen occasions from March 21, 2002, to May 22, 2003. In addition to other witnesses, Mountain Hill presented the testimony and report of Henry J. Ney regarding the traffic impact of the proposed application, which he compared with the traffic impact of a purported as-of-right plan, i.e., a plan that conformed to the Development Regulations and did not require any variances from the Zoning Board. Ney concluded that the proposed plan would have less impact than the as-of-right plan.

At a hearing on October 15, 2002, the Zoning Board addressed an issue that arose at earlier hearings respecting the as-of-right plan on which Ney relied. The Zoning Board previously determined that the reliability of Ney's opinion respecting the traffic impact of the proposed development depended on the accuracy of his assumption that the purported as-of-right plan conformed to the Development Regulations. There were two areas of concern addressed at the October 15, 2002, meeting: the accuracy of

Mountain Hill's calculation of the floor-area ratios for each zone, which excluded a multi-story garage from gross floor area, and the inclusion of four storm-water retention basins in the calculation of the open-space ratios. The retention basins would be graded out of the existing property with a clay layer installed to assist in preserving the wet nature of the basins. The basins would be filled with natural surface-water runoff and would be covered with topsoil and grass before being filled with water. If the runoff was insufficient to keep the basins filled, the water level would be maintained through supplemental piping. The design of the basins would be graduated with a ledge for safety purposes. Each basin would have a fountain to discourage algae growth. From the surface of the land, a person would see only water, grass and the fountains and could not see any of the pipes or other drainage structures.

Anthony P. Mercantante, the Township Planning Director, had earlier advised the Zoning Board that:

> It makes no sense from a Planning Standpoint to count parking garages towards Floor[-]Area Ratio (FAR). Floor[-]Area Ratio is designed to limit the intensity of a development. Parking garages do not generate traffic, they simply accommodate it. Parking garages are generally considered to be favorable uses since they result in a more efficient use of land and resources than surface parking. Including them in the FAR would in fact virtually ensure that they would never be built. Why would anyone give up Floor Area that is leasable and that generates revenue in favor of parking spaces in a multi-level garage which generate nothing and are in fact extremely expensive to build?

He also pointed out that the "Spy House Harbor" development and the AT & T project in Middletown both had multilevel parking garages and they were not included in the floor-area ratios. He further pointed to the "Performance Commercial Development" regulation, which permits a greater floor-area ratio when parking garages are included where the development meets other performance criteria. He stated, "Obviously it would be illogical to give a bonus that would immediately be eliminated with the inclusion of the parking garage."

With respect to open space, Mercantante opined that the MLUL "is quite vague on this issue." He suggested

that one reasonable way to ... consider this issue could be to consider retention basins or ponds as counting towards open space, since such areas can clearly be made an aesthetic and environmental feature of a development that contributes to the development as well as the community. On the other hand, detention or dry basins generally serve little or no potential value as open space since they are not easily accessible to the public and are not often an aesthetic feature.

With respect to floor-area ratio, Section 16–2.2 of the Development Regulations defines quite a number of terms used in Section 16. It states that " 'Floor[-]Area Ratio' means the ratio of the gross floor area to the lot area as determined by dividing the gross floor area by the lot area." Middletown Twp., N.J., Development Regulations § 16–2.2. "Floor" is defined as "a story of a building." *Ibid.* The term "floor area, gross" is defined as:

[T]he sum of the gross horizontal areas of the floor or several floors of a building measured between the outside face of exterior walls. In the case of residential structures, such area shall be finished in accordance with the requirements of the building code. Any cellar, garage, crawlspace, unfinished attic or space of any nature, or accessory building shall not be included. Any space with a clear ceiling height of four feet or more, but less than the minimum ceiling height prescribed in the building code for the type of building concerned shall not be included when in excess of ten percent of the floor area which complied with such prescribed ceiling heights.

[*Ibid.*]

Section 16–2.2 defines garage as: "a detached accessory building or portion of a main building for the parking or temporary storage of automobiles." It also provides that:

"Vertical Parking Garages" means a multi-level structure constructed for use as a facility for vehicular parking or storage. The levels can be above or below grade or both but in no case shall exceed the maximum height limitation for the district in which it is located.

[*Ibid.*]

Section 16–6.19 regulates the design of "commercial garages." Commercial garages in the M–1 and PD zones are accessory buildings. Section 16–6.19(A)(3) provides that "[a]n accessory commercial or industrial building garage shall be fully enclosed and have a full roof covering all parking spaces." Additionally, Section 16–6.19(A)(3)(b) provides that "[n]o portion of more than one level shall be above ground." "Residential garages" are

regulated by Section 16–6.19(B), the specific provisions of which are not relevant here.

Counsel to the Zoning Board observed that the issue of floor-area ratio did not affect the proposed development but did affect the as-of-right plan because it included a vertical parking garage. He advised that the MLUL defined floor-area ratio as "the sum of the area of all floors of buildings or structures compared to the total area of the site." *N.J.S.A.* 40:55D–4. Counsel stated that the Development Regulations attempted to amend that MLUL definition by defining gross floor area in a manner inconsistent with the MLUL. He opined that divergence from a definition in the MLUL was not permitted and that a parking garage is a building that has floors, based on a footnote in our opinion in *Commercial Realty and Resources Corp. v. First Atlantic Properties Co.,* 235 *N.J.Super.* 577, 583 n. 5, 563 *A.*2d 866[2] (App.Div. 1989), *modified,* 122 *N.J.* 546, 585 *A.*2d 928 (1991). Thus, he concluded that parking garages must be included in calculating the floor-area ratio. Although the Zoning Board considered Mercantante's opinion that garages were not intended to be included in the floor-area ratio, one member stated that the statute was very clear and inconsistent with that opinion. Thereafter, one member moved "that parking garages, multilevel garages, structures are structures and that is from the statute, so it[ ] clearly . . . should be part of FAR." The motion was unanimously approved.

With respect to the open-space ratio, Section 16–2.2 provides in pertinent part that

"Open Space" means any parcel or area of land or water essentially unimproved and set aside, dedicated, designated or reserved for public or private use or

---

2 In that footnote we stated:

"Floor[-]area ratio" is defined as "the sum of the area of all floors of buildings or structures compared to the total area of the site." *N.J.S.A.* 40:55D–4. The term "structures" includes not only "floors," but garage and parking lots. *See N.J.S.A.* 40:55D–3; *N.J.S.A.* 40:55D–7. "Floor[-]area ratio" is usually made applicable to non-residential structures, although not specifically limited to them in the statute. Legislative use is consistent with this interpretation. *See N.J.S.A.* 40:55D–45.1.

enjoyment or for the use and enjoyment of owners and occupants of land adjoining or neighboring such open space....

It also defines "open space, unoccupied" in pertinent part as

an unoccupied area including natural and man-made water courses, streams, lakes, ponds, and grassed, wooded, or landscaped areas, open to the sky on the same lot with a principal and/or accessory building.

[§ 16–2.2]

Lakes and ponds are also defined by Section 16–2.2:

"Lakes and Ponds" means natural or man-made bodies of water which normally contain or retain water for extended periods. Ponds are bodies of water with a surface area, measured under ten year storm conditions, of two acres or less. Lakes are bodies of water with a surface greater than two acres, measured under ten year storm conditions. The shoreline of a lake or pond is measured at the perimeter of the surface of water under ten year storm conditions, as certified by the applicant's licensed land surveyor, and approved by the Municipal Engineer. [*Ibid.*]

The section goes on to provide that the "open[-]space ratio" is "a measure of the inverse intensity of land use. It is arrived at by dividing total amount of open space within the site by the site area." *Ibid.*

At the October 15, 2002, meeting, the Zoning Board's counsel again advised that the definition of open space in the MLUL could not be changed by local ordinance. The MLUL defines "open space" as follows:

"Open-space" means any parcel or area of land or water essentially unimproved and set aside, dedicated, designated or reserved for public or private use or enjoyment or for the use and enjoyment of owners and occupants of land adjoining or neighboring such open space; provided that such areas may be improved with only those buildings, structures, streets and off[-]street parking and other improvements that are designed to be incidental to the natural openness of the land. [*N.J.S.A.* 40:55D–5.]

The Board's counsel further advised that it was for the Zoning Board to decide what "essentially unimproved" meant and to determine whether the retention basins were open space under the MLUL. He pointed to Section 16–6.28(C)(3) of the Development Regulations, which excludes flood-control basins and public drainage ways from Section 16–6.28 governing public open spaces and common open spaces, as supporting the exclusion of the retention basins from all open spaces. One board member then

made "a motion that we make an interpretation and that interpretation is necessary." When asked "[w]hat is the interpretation," that board member stated, "The way I'm reading this from what Mr. Vella just read, I'm reading that open space, that this is an improved area based on what Mr. Vella read and that it is not considered open space." Following a vote, the motion was adopted.

On November 12, 2002, counsel for Mountain Hill wrote to the Zoning Board's chairman protesting the resolution of both motions. He argued that the Zoning Board could only interpret the Development Regulations, not rewrite them, and that the Zoning Board should have given weight to Mercantante's opinions as he had been interpreting the Development Regulations for eight years.[3] Counsel asserted that Mountain Hill was creating a "man[-]made pond," which is specifically included as unoccupied open space. He argued that the Zoning Board "ignored the plain language of its [regulation], ignored its planners and ignored prior precedent in other applications." He contended that the Zoning Board erred in only relying on the advice of its attorney, two words in the MLUL taken out of context and Section 16–6.28 of the Development Regulations, which had no relevance to the issue at all.

With respect to floor-area ratio, Mountain Hill's counsel raised similar concerns about the basis for including garages and pointed out that the definition of "floor area, gross" in the Development Regulations specifically *excluded* garages from the calculation of floor area. He argued that the Zoning Board had no authority to conclude that the Township Committee violated the MLUL in adopting its Development Regulations and that its conclusion was "reversible error." He then withdrew the testimony of Ney

---

[3] Defendant does not dispute that Mercantante drafted the Development Regulations for the Township, although the record does not contain the legislative history of them.

respecting traffic impact and advised the Zoning Board that Mountain Hill would not produce him for further testimony.

Ultimately, the Zoning Board's members voted to deny Mountain Hill's application for a bifurcated use variance. A resolution was adopted on June 23, 2003, which memorialized the Zoning Board's May 22, 2003, decision. In denying the application, the Zoning Board considered whether the as-of-right plan was truly as-of-right. To make that determination the Zoning Board interpreted the open-space requirements of the MLUL and the definition of "floor area, gross" in Section 16–2.2 of the zoning regulations. The Zoning Board concluded that the storm-water management facilities in the as-of-right plan did not qualify as "open space" under the MLUL. It further concluded:

> An analysis of the construction, maintenance and purpose of the SWMF[4] by the Board led to the conclusion that the SWMF is clearly not "essentially unimproved", which is essential requirement for area to be "Open Space". The Board finds that there is a need to make substantial alterations to the land to create the SWMF. Further, the SWMF are designed solely for the purpose to accommodate the impervious areas of the site and not designed to accommodate the natural openness of the land. Based on these characteristics, the Board determined that the SWMF are not Open Space and should not be part of the Open Space requirement.

> [Resolution, *In the Matter of Case # 4481, Application of Mountain Hill, L.L.C.,* ¶ 6.]

It also concluded that the square footage of the commercial vertical parking garage in the PD zone on the as-of-right plan had to be included in gross floor area.

> The Board also reviewed the Commercial Vertical Parking Garages contained in the "As of Right Plan". The Applicant did not include the Floor Area of these structures in their calculations for Floor[-]Area Ratio (FAR). The Board was guided by the M.L.U.L. definition of FAR, which defines FAR as "the sum of the area of all floors of buildings or structures compared to the total area of the site". The term structure is also defined by the M.L.U.L. as "a combination of materials to form a construction for occupancy, use or ornamentation whether installed on, above or below the surface of a parcel of land". Based on these definitions, the Board determined that a Commercial Vertical Parking Garage is clearly a structure and the sum of all floors should be included in the calculations of FAR.

---

4 Storm Water Management Facilities.

The Applicant asserted that the Commercial Vertical Parking Garage is excluded from the calculation based on Middletown's definition of "Floor Area, Gross". The Applicant relied on language of Section 16–2.3 which states, "In the case of residential structures, such area shall be finished in accordance with the requirements of the building code. Any cellar, garage, crawl space, unfinished attic or space of any nature, or accessory building s[h]all not be included". The Applicant asserts that the term "garage" shall be read to include Commercial Vertical Garages and, thus, excluded from FAR calculations. The Board finds that this interpretation of Section 16–2.3 is completely inaccurate. The sentence preceding the sentence with garage specifically states, "In the case of residential structures". The Board finds this sentence applies to the next sentence and thus only residential garages are excluded from FAR, not Commercial Vertical Garages. The Board also finds that the other items contained in the sentence with "garage", i.e., cellar, crawl space and unfinished attic only related to residential structures. Thus, all the terms in the sentence with "garage" relate only to residential structures, no commercial structures, and are excluded from FAR. The Applicant's interpretation of this section would be against the intent and purpose of the Zoning Ordinance. Therefore, the Board concludes that the Commercial Vertical Parking Garages proposed in the "As of Right Plan" should be included in the FAR calculation.

[*Id.* at ¶¶ 7–8.]

As a consequence, the Zoning Board determined that the plan with which Ney compared the traffic impact of the proposed plan was not an as-of-right plan and rejected Ney's conclusions entirely. Because Mountain Hill elected not to submit a new as-of-right plan for traffic-impact analysis and withdrew Ney's testimony, the Zoning Board concluded that Mountain Hill's application was essentially a request to rezone the M–1 zone to a PD zone and denied Mountain Hill's application on multiple grounds.

## B.

Sometime after the Zoning Board voted at the October 15, 2002, hearing, Mountain Hill concluded that the Zoning Board would not grant any variance to it and Mountain Hill decided to develop an as-of-right plan to submit to the Planning Board. Fully engineered, as-of-right plan drawings dated December 23, 2002, were submitted to Mercantante with an Application for Development Permit on January 3, 2003, which also sought a consolidation subdivision into one lot. The transmittal letter asked Mercantante to deny the development permit and promptly refer it to the

Planning Board. By letter of January 16, 2003, Marianne Hanko, the Township Zoning Officer, referred the application to the Zoning Board on the ground that a variance pursuant to *N.J.S.A.* 40:55D–70(d) was required due to the inclusion of the vertical parking garage in gross floor area caused the plan to exceed the maximum floor-area ratio permitted in the PD and M–1 zones. Hanko also observed that the inclusion of retention basins in the percentage calculation of open space had already been determined by the Zoning Board. This denial was supported by an opinion letter from the Township Attorney, opining in part that a consolidation subdivision into one split-zoned lot was not permitted in order to avoid the zone setbacks.

Rather than return to the Zoning Board on the same issues it had already considered with respect to the September 19, 2000, application, Mountain Hill requested that its engineers prepare a second as-of-right plan to conform to the Zoning Board's allegedly erroneous interpretations of "gross floor area" and "open space." The revised, fully engineered drawings dated July 2, 2003, included parking garages in gross floor area, excluded retention basins from open space and eliminated the proposed theatre and hockey rink. Mountain Hill submitted the second as-of-right plan and an Application for a Development Permit to Mercantante on July 29, 2003. Mountain Hill again requested that Mercantante deny the application and promptly submit it to the Planning Board, expressing concern that some of the parking spaces might require a design waiver and noting that this was Mountain Hill's third application and not an amendment of any prior application.

The second as-of-right plan dated July 2, 2003, has seven access points in the PD zone and five access points in the M–1 zone where drivers can enter and exit the property from and to public streets. The drawings included five internal driveways permitting persons on the property to drive from one zone to the other without exiting onto any public street. In addition, the plan had several buildings that straddled the zone line with uses in the

buildings that conformed to the zone in which the use was located but not to the other zone in which the building was located.

Rather than submit the July 29, 2003, application to the Planning Board, on August 12, 2003, Hanko again denied the development permit asserting that a(d) variance was required for the driveways providing access between the PD and M–1 zones, a(c) variance was required for buildings not sufficiently set back from the zone line boundary of the PD and M–1 zones and a possible (c) or (d) variance might be required with respect to the reconfigured open space in each zone. This denial was again supported by an opinion letter from the Township Attorney.

After receiving the August 12, 2003, denial letter, Mountain Hill wrote to Hanko on August 15, 2003, and sought a meeting with her and the Township Attorney to discuss the reasons for the denial. Mountain Hill also advised them that its engineers were in the process of revising the second as-of-right plans to eliminate the residential uses in one of the cross-zone buildings. The amended, second as-of-right, fully engineered drawings are dated August 19, 2003, and eliminate the residential use from the cross-zone building. Mountain Hill submitted this amended plan on August 27, 2003, with another Application for Development Permit and requested submission of the plans to the Planning Board. On September 11, 2003, Joseph Kachinsky, the Township Construction Official, denied this application for a development permit because the "drive/access-ways, parking and accessory facilities located in the M1 ... zoned area servicing or accessory to the PD ... area and uses" required a(d) variance and "structures not having the required setback from the property/boundary line in the M1 zone" required a bulk (c) variance. Once again, this denial was supported by a September 11, 2003, opinion letter from the Township Attorney in which he cited case law and Section 16–9.23 of the Development Regulations to support the Township's position that variances were required, in part because there was a "serious issue" about whether Mountain Hill would be permitted

to consolidate its land into one lot. On September 15, 2003, a Corrected Denial of Development Permit was issued by Hanko.

These denials led Mountain Hill on September 17, 2003, to file an Application for Interpretation and Appeal to the Zoning Board in which it raised five issues. In the meantime, Mountain Hill instructed its engineers to again revise the second as-of-right plan to eliminate all cross-zone buildings and driveways. The Zoning Board conducted hearings on three occasions between November 24, 2003, and January 26, 2004,[5] at which testimony from Mountain Hill's professional planner, Richard Preiss, was presented on all five issues. On January 26, 2004, the Zoning Board voted to affirm the Zoning Officer and a resolution to that effect was adopted on March 22, 2004.

The first issue related to the direct private access between the PD and M–1 zones. The Zoning Board concluded that a(d) variance was required because the private access roads in the M–1 zone are accessory structures to the uses in the PD zone that are not permitted in the M–1 zone.

The second issue related to setbacks from the zone line. The Zoning Board determined that, while consolidation of all the lots would eliminate the lot lines, it would not eliminate the zone line. The Zoning Board held that any requirement for a setback from a zone, zone line or use would still be applicable.

The third issue related to a building straddling the zone line with uses segregated by zone. The Zoning Board held that segregated uses were uncontrollable, that a building cannot have split uses and that parking lots in one zone utilized for a use in the other zone would become nonconforming.

The fourth and fifth issues related to whether a single lot could be split zoned and whether the property could be developed as an integrated development. The Zoning Board ruled that the ques-

---

[5] These hearings were subsequent to all sixteen hearings that are the subject of *Mountain Hill IV*.

tions were hypothetical and that it was not authorized or empowered to answer such questions under *N.J.S.A.* 40:55D–70(b).

## II.

### A.

Mountain Hill alleged a multiplicity of claims in its June 27, 2003, complaint in lieu of prerogative writs challenging the Zoning Board's October 15, 2002, determinations. However, Mountain Hill abandoned all claims prior to the conclusion of the lawsuit except for the two issues decided by the trial judge relating to the Zoning Board's interpretations of the MLUL and the Development Regulations respecting open space and floor-area ratio. Although these two issues were decided by the Zoning Board in the context of considering Ney's hypothetical as-of-right plan, those interpretations caused Mountain Hill to prepare and submit various putative as-of-right plans on January 3, July 29, and August 27, 2003. If the interpretations were erroneous, Mountain Hill was entitled to have one or more of its as-of-right Applications for Development Permit submitted to the Planning Board.

After discovery Mountain Hill moved for summary judgment and the judge issued a written opinion on May 23, 2005. With respect to the issue of open space, the judge observed that the definition of open space in Section 16–2.3 of the Development Regulations tracked the MLUL definition of "open space." *N.J.S.A.* 40:55D–5. Both required that the property be "essentially unimproved" and any improvements must be "incidental to the natural openness of the land." The judge explained that Mountain Hill's retention ponds on its as-of-right plan would not qualify as open space under the MLUL because the ponds would require substantial alterations to the land. However, he concluded that the retention ponds would qualify as open space under the additional definition of "unoccupied open space" in the Development Regulations and noted that the Supreme Court in *Rumson Estates, Inc. v. Mayor and Council of the Borough of Fair Haven,*

177 *N.J.* 338, 354, 828 *A.*2d 317 (2003), held that "nothing in the legislative history or in the MLUL itself ... suggest[s] that the Legislature ... intended the definitional language to constitute a broad prohibition on municipal zoning initiatives."[6]

The judge observed that "open space, unoccupied" in the Development Regulations included "man-made water courses, streams, lakes, and ponds ... open to the sky on the same lot with a principal and/or accessory building." He further noted the definition of "Lakes and Ponds" in the Development Regulations included "natural or man-made bodies of water which normally contain or retain water for extended periods." He then held:

> Here, the testimony of Mountain Hill's engineering expert adequately demonstrated that the proposed wet detention basins would be aesthetically designed to look like man-made ponds. There is simply no evidence in the record to refute the conclusion that the basins constitute "man-made bodies of water which normally contain or retain water for extended periods." As such, the court finds that the proposed basins qualify as man-made ponds.
>
> The fact that the ponds will also serve as part of the project's storm water management facilities is inconsequential. So long as the wet detention basins serve the same aesthetic functions as man-made ponds, they qualify as unoccupied open space. Indeed, impervious drainage facilities are included in the Township's definition of open space. Therefore, if "open space" can be utilized as part of a storm water management plan, then "unoccupied open space" should also be permitted to function as a storm water management facility.

Turning to the inclusion of the vertical parking garages in the floor-area ratio, the judge noted that under the MLUL floor-area ratio "is calculated by dividing the sum of the area of 'all floors of buildings and structures' in square feet by the 'total area of the site' in square feet" citing *N.J.S.A.* 40:55D–4. Because *N.J.S.A.* 40:55D–7 defines "structure" as "a combination of materials to form a construction for ... use ... on, above, or below the surface of ... land," the judge agreed with the Zoning Board that the vertical parking garages would be included in the floor-area ratio under the MLUL.

---

6 The *Rumson* Court also made it very clear that municipal zoning ordinances, nonetheless, must advance one of the goals of the MLUL set forth in *N.J.S.A.* 40:55D–2. *Id.* at 349–50, 828 *A.*2d 317.

However, the judge concluded in light of *Rumson* that the Zoning Board erred in relying on the MLUL definitions to determine whether the garage had to be included in the floor-area ratio. He turned to the definition of "floor area, gross" in the Development Regulations. He focused in particular on the exclusionary sentence that reads: "Any cellar, garage, crawlspace, unfinished attic or space of any nature, or accessory building shall not be included." He found that this language was opaque and ambiguous and turned to extrinsic factors to ascertain the intent of the Township Committee. He considered "the rule of *ejusdem generis,* 'where general words follow the enumeration of [a] particular class of things, the general words will be considered as applying only to things of the same general class as those enumerated.'" This led the judge to conclude that the general-exemption sentence under examination applied only to residential structures because the immediately preceding sentence read: "In the case of residential structures, such area shall be finished in accordance with the requirements of the building code."

The judge also observed that "[t]hese terms are all common names or terminology for areas in single family houses." As a result, he found that "the doctrine of *noscitur a sociis* further supports the conclusion that only residential garages are excluded from the gross floor area." He noted this doctrine teaches that "'the coupling of words denotes an intention that they should be understood in the same general sense,'" citing *Department of Health v. Sol Schnoll Dressed Poultry Co.,* 102 *N.J.Super.* 172, 177, 245 *A.*2d 532 (App.Div.1968). The judge also found that because "garage" was coupled with cellar, crawl space and attic, it too must be only residential.

Last, the judge observed that Section 16–8.15 of the Development Regulations provided a floor-area ratio bonus for commercial developments that "'[l]ocate off-street parking within a structure or underground thereby reducing impervious coverage, allowing for more open space, preserving natural features, reducing site disturbance, and improving the public view of the development

site.'" Resorting to the rule of *in pari materia* and "applying the provisions of Sections 16–8.15 together with the definition of gross floor area, it appears that the governing body of Middletown Township intended to include commercial garages in its FAR calculation." He reasoned:

> Under this framework, there is a "give and take" relationship between the Township and the developer: in order to create an incentive for developers to include parking garages in their commercial developments, the Township will offset the floor area of the commercial garage with a FAR bonus. If, however, commercial garages were excluded from the initial FAR calculation, then developers will be permitted to develop their properties at higher intensity levels by simply including parking garages in their development. Such a result undermines the general purpose of FAR regulations, which is to limit rather than increase the intensity of land use.

The judge rejected Mountain Hill's reliance on Mercantante's letter and a prior project developed without inclusion of its vertical parking garage in the floor-area ratio.[7] He concluded that a single approval by the Planning Board and the opinion of Mercantante were not entitled to significant weight because their interpretations conflicted with those of the Zoning Board and "the governing body has not expressed its intent in any other form except the plain language of the FAR definition." In any event, the judge noted that Mercantante's memorandum did not address the definition of floor-area ratio and was, thus, inapposite.

### B.

On April 30, 2004, Mountain Hill filed another action in lieu of prerogative writs challenging the Zoning Board's determination of Mountain Hill's September 17, 2003, Application for Interpretation and Appeal. Mountain Hill then filed a motion for summary judgment on November 18, 2004, and the Zoning Board cross-moved for the same relief. In his March 11, 2005, written opinion, the judge addressed each of the five issues. As to the first issue respecting internal driveways connecting the PD and M–1 zones, the judge observed that some of the uses in the PD zone,

---

[7] In actuality, there were two such prior projects.

residences, a department store and a supermarket, are prohibited in the M-1 zone. After discussing accessory uses, the judge concluded that a(d) variance was necessary to construct the proposed driveways because they would service the uses in both zones, meaning that they would take on the attributes of the uses in both zones. The judge rejected Mountain Hill's argument that a variance was not needed because no access through the M-1 zone was required to access the PD zone because both zones had multiple access points from the surrounding public streets.

As to the second issue of setbacks for buildings located along the zone lines, the judge concluded that the Development Regulations did not specifically mandate that setbacks apply to zone boundary lines and thus no bulk variances were required for buildings along the zone lines.

As to the third issue of a building straddling the zone line where the building had a residential use in the PD zone that is not a permitted use in the M-1 zone, the judge determined that a use variance was required pursuant to *N.J.S.A.* 40:55D-70(d)(1). The judge concluded that there was no case law that permitted Mountain Hill to create an "invisible wall" to avoid a variance application.

As to the fourth issue, which the Zoning Board considered hypothetical, the judge held that the issue was justiciable and that Section 16-4.8 of the Development Regulations governed the issue of whether a consolidation subdivision can be granted where the consolidated lot was split zoned. The judge found that there was no provision in the MLUL, or the Development Regulations that required that the consolidated subdivision be split into two lots along the zone lines.

Finally, the judge agreed with the Zoning Board that the fifth issue, integrated development, was beyond the scope of an interpretation appeal and not justiciable because it was a function of whether Mountain Hill can design the project so that it complied with the MLUL and the Development Regulations.

The Zoning Board sought reconsideration of the second issue relating to setbacks from zone lines. The judge found on May 5, 2005, that the PD zone did have a fifty-foot setback requirement for residential structures within the PD zone and amended his decision to limit his ruling to nonresidential buildings located along the PD/M–1 zone boundary line. He entered an order that day affirming the Zoning Board's "findings as to the setback requirements," which amended the March 17, 2005, order. This appeal followed.

### III.

Mountain Hill contends in the first of these two appeals that the Development Regulations exempt a commercial parking garage from inclusion in the floor-area ratio. The Zoning Board, on the other hand, contends on its cross-appeal that the Development Regulations including man-made ponds and lakes in the definition of "open space, unoccupied" must be shown to advance the goals of the MLUL under the *Rumson* Court's analysis and that Mountain Hill's storm-water drainage facilities do not do so because they require substantial alterations to the land.

In the second of these two appeals, Mountain Hill contends that the judge erred in concluding that a use variance was required for the interconnecting driveways in the PD and M–1 zones. Mountain Hill also argues that the judge erred in concluding that a building straddling a zone line could not divide uses within the building by zone line because nothing in the MLUL or the Development Regulations prohibited such a building. The Zoning Board cross-appeals from the judge's conclusion that a consolidation subdivision with the resulting lot being split zoned was not prohibited.

When the sole issue before us is the meaning of language in an ordinance, the trial judge's determination is not entitled to any special deference because the issue is one of law which is always subject to review *de novo*. *Toll Bros., Inc. v. Twp. of W. Windsor*, 173 *N.J.* 502, 549, 803 *A.*2d 53 (2002); *Balsamides v.*

*Protameen Chems., Inc.,* 160 *N.J.* 352, 372, 734 *A.2d* 721 (1999). The same standard applies to review of an interpretation given to an ordinance by municipal boards.

Although a municipality's informal interpretation of an ordinance is entitled to deference, *Fallone Props., L.L.C. v. Bethlehem Twp. Planning Bd.,* 369 *N.J.Super.* 552, 561, 849 *A.2d* 1117 (App.Div.2004), that deference is not limitless. As with other legislative provisions, the meaning of an ordinance's language is a question of law that we review de novo. *In re Distribution of Liquid Assets,* 168 *N.J.* 1, 11, 773 *A.2d* 6 (2001); *DePetro v. Twp. of Wayne Planning Bd.,* 367 *N.J.Super.* 161, 174, 842 *A.2d* 266 (App.Div.2004).

[*Bubis v. Kassin,* 184 *N.J.* 612, 627, 878 *A.2d* 815 (2005).]

*See also Wyzykowski v. Rizas,* 132 *N.J.* 509, 518, 626 *A.2d* 406 (1993).

 Thus, we construe the Development Regulations anew. The rules that we apply to statutory interpretation have been summarized recently by our Supreme Court:

The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language. *Frugis v. Bracigliano,* 177 *N.J.* 250, 280, 827 *A.2d* 1040 (2003). We ascribe to the statutory words their ordinary meaning and significance, *Lane v. Holderman,* 23 *N.J.* 304, 313, 129 *A.2d* 8 (1957), and read them in context with related provisions so as to give sense to the legislation as a whole, *Chasin v. Montclair State Univ.,* 159 *N.J.* 418, 426–27, 732 *A.2d* 457 (1999). It is not the function of this Court to "rewrite a plainly-written enactment of the Legislature [ ] or presume that the Legislature intended something other than that expressed by way of the plain language." *O'Connell v. State,* 171 *N.J.* 484, 488, 795 *A.2d* 857 (2002). We cannot "write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment," *Craster v. Bd. of Comm'rs of Newark,* 9 *N.J.* 225, 230, 87 *A.2d* 721 (1952), or "engage in conjecture or surmise which will circumvent the plain meaning of the act," *In re Closing of Jamesburg High School,* 83 *N.J.* 540, 548, 416 *A.2d* 896 (1980). "Our duty is to construe and apply the statute as enacted." *Ibid.*

A court should not "resort to extrinsic interpretative aids" when "the statutory language is clear and unambiguous, and susceptible to only one interpretation...." *Lozano v. Frank DeLuca Const.,* 178 *N.J.* 513, 522, 842 *A.2d* 156 (2004) (internal quotations omitted). On the other hand, if there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, "including legislative history, committee reports, and contemporaneous construction." *Cherry Hill Manor Assocs. v. Faugno,* 182 *N.J.* 64, 75, 861 *A.2d* 123 (2004) (internal quotations omitted). We may also resort to extrinsic evidence if a plain reading of the statute leads to an absurd result or if the overall statutory scheme is at odds with the plain language. *See Hubbard ex rel. Hubbard v. Reed,* 168 *N.J.* 387, 392–93, 774 *A.2d* 495 (2001).

[*DiProspero v. Penn,* 183 *N.J.* 477, 492–93, 874 *A.2d* 1039 (2005).]

 Municipal "[z]oning ordinances are to receive a reasonable construction and application, and ... are to be liberally construed in favor of the municipality." *Place v. Bd. of Adjustment, Borough of Saddle River,* 42 *N.J.* 324, 328, 200 *A.2d* 601 (1964). However, "[z]oning regulations are restrictive of property rights and ought not to be too broadly interpreted against the possessor thereof." *Skinner v. Zoning Bd. of Adjustment, Twp. of Cherry Hill,* 80 N.J.Super. 380, 388, 193 A.2d 861 (App.Div. 1963). Such "limitations on the use of private property must be clearly and expressly imposed, and should not be inferred." *Hrycenko v. Bd. of Adjustment, City of Elizabeth,* 27 *N.J.Super.* 376, 379, 99 *A.2d* 430 (App.Div.1953) (finding that the Elizabeth ordinance did not prohibit construction of more than one building on a lot); *see also Twp. of Pennsauken v. Schad,* 307 *N.J.Super.* 493, 499, 704 *A.2d* 1337 (App.Div.1998), *rev'd on other grounds,* 160 *N.J.* 156, 733 *A.2d* 1159 (1999).

 As we said in *Bern v. Borough of Fair Lawn,* "the principle [is] that a zoning restriction should not be interpreted to proscribe a given use of private property unless it does so with reasonable clarity." 65 *N.J.Super.* 435, 444–45, 168 *A.2d* 52 (App.Div.1961). "[A] citizen who seeks in good faith to utilize his property ... should not [be required to] depend upon the outcome of litigation after the event in which a provision, which he apparently fully meets, assumes a new and different significance by a process of refined interpretation." *Jantausch v. Borough of Verona,* 41 *N.J.Super.* 89, 104, 124 *A.2d* 14 (Law Div.1956), *aff'd,* 24 *N.J.* 326, 131 *A.2d* 881 (1957). Thus, "[r]estrictions in zoning ordinances must be clearly expressed and doubts are resolved in favor of the property owner." *Graves v. Bloomfield Planning Bd.,* 97 *N.J.Super.* 306, 312, 235 *A.2d* 51 (Law Div.1967).

## IV.

 The threshold question before us respecting "floor area, gross" is the "ordinary meaning and significance" of the language used to define that term in Section 16–2.2. *Ibid.* (citing *Lane,*

*supra*, 23 *N.J.* at 313, 129 *A.*2d 8). The first sentence of the definition, "the sum of the gross horizontal areas of the floor or several floors of the building measured between the outside face of exterior walls," is not in the least ambiguous.

The third sentence, "[a]ny cellar, garage, crawlspace, unfinished attic or space of any nature, or accessory building shall not be included," standing alone, could hardly be misunderstood. "Any" means "one or another without restriction or exception." *Webster's II New College Dictionary*, 51 (1995). And it is clear from the Development Regulations that the Township Committee understood that there was more than one type of garage because Section 16–2.2 defines both "garage" and "vertical parking garage" without any limitation by type of use. *See Keith Mach. Corp. v. Borough of S. Plainfield*, 89 *N.J.Super.* 584, 590–91, 215 *A.*2d 788 (Law Div.1965) ("Where a word or phrase occurs more than once in a statute, it should have the same meaning throughout, unless there is a clear indication to the contrary."), *aff'd*, 91 *N.J.Super.* 469, 221 *A.*2d 47 (App.Div.1966). Furthermore, Section 16–6.19(A) governs "commercial garages" and Section 16–6.19(B) applies to "residential garages." Thus "any garage" encompasses residential and commercial garages, both single level and multilevel.

 Does the interposition of the second sentence relating to the requirement that residential structures be finished in accordance with the building code change the meaning of the third? We think not. The beginning of the sentence, "[i]n the case of residential structures," is a qualification of the definition in the first sentence, and distinguishes residential gross floor areas from all nonresidential gross floor areas by providing that "such area" (the "gross horizontal areas of the floor or several floors of the [residential] building") "shall be finished in accordance with the requirements of the building code."

Where no contrary intention appears, qualifying words refer solely to the last antecedent. *State in Interest of S.Z.*, 177 *N.J.Super.* 32, 35, 424 *A.*2d 855 (App.Div.1981); *Gudgeon v. County of Ocean*, 135 *N.J.Super.* 13, 17 n. 1, 342 *A.*2d 553 (App.Div.1975); *State v. Congdon*, 76 *N.J.Super.* 493, 502, 185 *A.*2d 21

(App.Div.1962); *Raybestos–Manhattan, Inc. v. Glaser,* 144 *N.J.Super.* 152, 168, 365 *A.*2d 1 (Ch.Div.1976), *aff'd,* 156 *N.J.Super.* 513, 384 *A.*2d 176 (App.Div.1978); 2A Sutherland, *Statutory Construction,* § 47.33 at 245 (4th ed. 1984).

[*In re Dep't of Cmty. Affairs Order of March 15, 1988 Regarding Burlington County Recycling Facility,* 232 *N.J.Super.* 136, 141, 556 *A.*2d 807 (App.Div.1989).]

Commercial space does not have to be finished and often is not finished until a tenant has been secured and specified the configuration and finish of the interior.

Our understanding of the second sentence is supported by the language of the fourth sentence, which again concerns itself with any "type of building" and, thus, clearly does not relate solely to "residential structures" any more than does the sentence respecting "any garage" or "any accessory building." Where the statutory language is clear, we "should probe no further than the literal meaning of the . . . words." *Micheve, L.L.C. v. Wyndham Place at Freehold,* 370 *N.J.Super.* 524, 530, 851 *A.*2d 743 (App.Div. 2004) (quoting *Lewis v. Bd. of Trustees, Pub. Employees' Ret. Sys.,* 366 *N.J.Super.* 411, 415, 841 *A.*2d 483 (App.Div.), *certif. denied,* 180 *N.J.* 357, 851 *A.*2d 650 (2004)).

Furthermore, the conclusion that "any garage" applies to all residential and nonresidential buildings makes sense when "read . . . in context with related provisions so as to give sense to the legislation as a whole." *DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039 (citing *Chasin, supra,* 159 *N.J.* at 426–27, 732 *A.*2d 457). This is so because the Development Regulations seek to preserve open space and reduce impervious coverage. Mountain Hill is not building a vertical garage in order to secure a higher floor-area ratio as a "Performance Commercial Development" under Section 16–8.15.[8] Its proposed development does not reach the maximum floor-area ratio for the M–1 or PD zones. No reasonable developer would allocate any portion of the maximum floor-area ratio to a

---

[8] It does not appear that Performance Commercial Development applies either to the M–1 or PD zone. § 16–8.15(B), (C). Indeed, the floor-area ratio for the PD zone is equal to the highest floor-area ratio permitted in any of the zones to which the Performance Commercial Development provisions apply. *Compare* § 16–8.15(B), (C), *and* § 16–9.39(B)(3).

vertical parking garage. Rather, if a vertical parking garage had to be included in gross floor area, developers would not build them but rather would maximize impervious surfaces and minimize open space.

We also cannot adopt the interpretation urged upon us by the Zoning Board because "[w]e cannot 'write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment.'" *Ibid.* (citing *Craster, supra,* 9 *N.J.* at 230, 87 *A.*2d 721). Yet that is precisely what the Zoning Board suggests we do, insert the word "residential" between "any" and "cellar."[9] We decline to do so. Because the statutory language was "clear and unambiguous," the judge should not have resorted "to extrinsic interpretative aids." *Ibid.* (citing *Lozano, supra,* 178 *N.J.* at 522, 842 *A.*2d 156).

Finally, we conclude that the exclusion of garages from the gross floor area of commercial buildings is consistent with and advances the MLUL goals to provide and promote the conservation of open space despite the inconsistent definitions in the MLUL and the Developmental Regulations. *N.J.S.A.* 40:55D–2(c), (j). Without this exclusion in the scheme of these Development Regulations, builders would be more likely to cover their properties with impervious surfaces rather than seek to maximize open space.

## V.

The Zoning Board contends that the judge erred when he concluded that storm-water management facilities that are constructed as man-made ponds may be included in the calculation of open space under the Development Regulations. It bases that

---

9 We disagree with the trial judge's statement that cellars, crawlspaces, unfinished attics and accessory buildings are only found in single-family homes. Many commercial buildings have cellars, as do town homes, apartment buildings and retail stores, many of which in cities have a staircase to the cellar in the middle of the sidewalk.

argument on the provisions in the MLUL and the Development Regulations that open space is "any parcel or area of land or water *essentially unimproved* and set aside, dedicated, designed or reserved for public or private use." It contends that the Township did not make any finding that it intended to change the MLUL definition of open space and the judge did not conclude that the changes in the open-space definition advanced any goal of the MLUL. It urges that the judge erred in ruling on the open-space issue as he did because any departure from the requirements of "essentially unimproved" and "used for public purposes" is inconsistent with the goals of the MLUL. The Zoning Board asserts that the definition of "open space, unoccupied," as including man-made lakes and ponds does not modify the basic definition of "open space," which applies to only "essentially unimproved" areas.

We again begin with the plain language of the MLUL and the Development Regulations. *DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039. The entire definition of open space in Section 16–2.2 of the Development Regulations sheds light on the issue before us:

> "Open Space" means any parcel or area of land or water essentially unimproved and set aside, dedicated, designated or reserved for public or private use or enjoyment or for the use and enjoyment of owners and occupants of land adjoining or neighboring such open space; provided that such areas may be improved with only those buildings, structures, streets and other improvements that are designed to be incidental to the natural openness of the land. Impervious surfaces within open space areas shall be limited to improvements associated with recreation and drainage facilities and underground utilities.

The underscored language was added to the MLUL definition of open space by the Township Committee. Thus, it was clearly the intent of the Township to permit impervious surfaces in open spaces for drainage facilities, such as the retention basins proposed for this development.

We do not consider the last sentence of the definition at odds with the first sentence or the MLUL at all. Rather, it makes it abundantly clear that the inclusion of impervious drainage facilities in "open space" is *not* inconsistent with the requirement that

open space be "essentially unimproved." That term simply does not mean "essentially *undisturbed*," contrary to the implication in the Zoning Board's argument. Indeed, the definition of unoccupied open space makes it perfectly clear that "unimproved" does not mean "undisturbed" because unoccupied open space specifically includes "man-made water courses, streams, lakes, ponds, and grassed, wooded, or landscaped areas," all of which require disturbance of the land. *See Byram Twp. v. W. World*, 111 *N.J.* 222, 232, 544 *A.*2d 37 (1988) (minimal agricultural activity may be consistent with "open space").

These conclusions are further supported by the provisions of Section 16-6.28 of the Development Regulations, which govern *public* open space and *common* open space. That section specifically does "not apply to . . . flood control basins . . . as necessitated by the subdivision of land development as required for final approval." § 16-6.28(C)(3). This express exclusion would only be necessary if the definitions of open space and unoccupied open space *included* flood control basins that otherwise meet the definitions of such space. *Bd. of Educ. of Hackensack v. City of Hackensack*, 63 *N.J.Super.* 560, 569, 165 *A.*2d 33 (App.Div.1960) ("[L]egislative language must not, if reasonably avoidable, be found to be inoperative, superfluous or meaningless.").[10] Thus,

---

[10] The Zoning Board points to the testimony of Ralph Orlando, P.E., on behalf of plaintiff in which he apparently testified that the retention basins were not designed or utilized to accommodate the natural openness of the land, testimony on which the defendant partly relied in concluding that the retention basins were inconsistent with the definition of "open space." This testimony of Orlando is not in the record before us and we decline to address the issue. Even if we were to do so, the defendant's decision misconstrues the definition of "open space" because the term "natural openness" appears only in the proviso that open space may be improved with structures that are designed to be incidental to the natural openness of the land. " 'Structure' means a combination of materials to form a construction for occupancy, use or ornamentation whether installed on, above, or below the surface of a parcel of land." *N.J.S.A.* 40:55D-7. Provisos are to be strictly construed, *Prado v. State*, 186 *N.J.* 413, 426, 895 *A.*2d 1154 (2006) ("A general principle of statutory interpretation is that 'exceptions in a legislative enactment are to be strictly but reasonably construed, consistent with

the proposed retention basins in "open space" are permitted by the plain meaning of the language in the Development Regulations. *See Micheve, L.L.C., supra,* 370 *N.J.Super.* at 530, 851 *A.*2d 743. The judge did not err in so concluding.

We understand from Mountain Hill that it does not seek a remand to the Zoning Board for consideration of its two applications for use variances because it intends to limit its development efforts to an as-of-right plan. Mountain Hill's January 3, 2003, Application for Development Permit should not have been denied based on the Zoning Board's erroneous interpretations of open space and gross floor area. Instead, that application should have been referred to the Planning Board.

## VI.

With respect to the interconnecting driveways and parking lots between the PD and M–1 zones contained in the second as-of-right plans attached to the July 2, 2003, Application for Development Permit, as amended on August 27, 2003, each zone standing alone has sufficient parking to accommodate all of the uses in that zone. It is undisputed that all of the uses in the M–1 zone are permitted in the PD zone. The only uses in the PD zone that are not permitted in the M–1 zone are residences, grocery stores and department stores. There is no need for a variance in either zone to access the other in order to get on or off public streets because the PD zone has seven access and egress points to public streets and the M–1 zone has five.

It is the Zoning Board's position that movement of users from the M–1 zone into the PD zone requires a variance because the portion of the cross-zone driveways located in the M–1 zone is an accessory use to the PD zone, citing *Angel v. Board of Adjustment*

---

the manifest reason and purpose of the law.' " (quoting *Serv. Armament Co. v. Hyland,* 70 *N.J.* 550, 558–59, 362 *A.*2d 13 (1976))), and the retention basins hardly seem to be "structures." Rather, they are created by grading the land, lining them with clay, and piping water into them.

of the Township of Franklin, 109 N.J.Super. 194, 197, 262 A.2d 890 (App.Div.1970). At the hearing on November 24, 2003, Mountain Hill's professional planning expert, Richard Preiss, testified that he could not find any provision in the MLUL or the Development Regulations that prohibit cross-zone access from one side of the development to the other such that a(c) or (d) variance was required to permit it. The Zoning Board does not dispute this testimony by pointing to any provision in its Development Regulations barring cross-zone access. It relies entirely upon case law addressing accessory uses.

The term "driveway" is defined as "a private road connecting house, building, garage, accessory building or parking area with the street." Middletown Twp., N.J., Development Regulations, § 16–2.2. The MLUL and the Development Regulations do not include driveways among accessory structures or uses. Nor need they do so, because a use or structure may be a bona fide accessory use or structure if it is incidental to a principal use or structure and customary to the use of that structure. State v. P.T. & L. Const. Co., Inc., 77 N.J. 20, 26–27, 389 A.2d 448 (1978). An "accessory use" is one that "is clearly incidental and is customarily found in connection with and located on the same zoning lot as the principal use to which it is related." 2 Arden H. Rathkopf & Daren A. Rathkopf, The Law of Zoning and Planning § 33:1 (2007). Driveways are so ineluctably incidental to any main structure and so customary for all structures that they are permitted accessory structures and uses in every zone.

The term "accessory use" often refers to nonconforming uses that bear some relationship to the permitted use. Id. at § 33:4. These uses are usually allowed as long as they are "customarily incidental to the principal use," meaning that they are integral parts of the intended use. Ibid. For example, maintaining a private car garage is customarily incidental to residential use. Ibid.

Query whether the mere connection of driveways from the M–1 zone to the PD zone requires a variance where each zone has no

need of cross-zone connection for access, although good planning would provide for cross-zone access in a single development to reduce the traffic impact of the project on the surrounding public streets. The parties cite only two reported decisions respecting a driveway over property in one zone that is used to access a use or structure in another zone, *Beckmann v. Township of Teaneck*, 6 *N.J.* 530, 79 *A*.2d 301 (1951), and *Angel, supra*, 109 *N.J.Super.* 194, 262 *A*.2d 890.

Little guidance is found in *Beckmann*. The Beckmanns had a commercial building on land adjoining Route 4 in Teaneck that was located 150 feet from the centerline of the highway on the portion of its land that was zoned for commercial uses. *Beckmann, supra*, 6 *N.J.* at 534, 79 *A*.2d 301. The land between the highway and the commercial building was zoned for residential use. *Ibid.* A driveway to the building was extended from the highway over the residential portion of the land in order to access the commercial building. *Id.* at 533, 79 *A*.2d 301. Teaneck had entered into an agreement to permit the construction of the commercial building, which included a clause requiring it to take such municipal action as may be necessary for its construction. *Id.* at 533–34, 79 *A*.2d 301. The Court observed: "A driveway in itself is neutral. It is neither business nor otherwise. It takes color from the uses permitted by the zoning ordinance of the lands in the area." *Id.* at 536, 79 *A*.2d 301. The Court found that access to the building must have been contemplated in the agreement and concluded that the driveway over the residential land was permitted. *Id.* at 536–37, 79 *A*.2d 301.

In the second case, Angel owned property abutting Route 24 in Franklin Township on which was a trailer park, a pre-existing nonconforming use. *Angel, supra*, 109 *N.J.Super.* at 196, 262 *A*.2d 890. The State requested that the driveway for the trailer park be widened, which would require the removal of a tree and the relocation of a utility pole. *Ibid.* Angel, preferring to construct a second driveway, purchased two adjoining lots in a commercial zone that did not permit mobile home parks. The township

committee considered and rejected the matter on the ground that access points to the highway should be minimized and the new driveway would be a severe inconvenience to the homeowner of the lot next to the proposed second driveway. *Ibid.* Nonetheless, Angel secured an access permit from the State Highway Department and constructed the driveway. *Ibid.* The building inspector issued a notice of violation. *Ibid.*

The zoning board conducted three public hearings and "found that the driveway was a structure and constituted an accessorial use serving a nonconforming use, and that its existence and use contravened the zoning ordinance." *Id.* at 197, 262 *A.*2d 890. The board denied a use variance because it would be a " 'substantial detriment to the public good' " and " 'substantially impair the intent and purpose of the zone plan and zoning ordinance.' " *Ibid.*

We held that a driveway is a "structural appurtenance attached to land," contrary to the argument advanced by the plaintiff. *Ibid.* We then addressed plaintiff's argument that the driveway was an inherently permitted use in the commercial zone. *Id.* at 197–98, 262 *A.*2d 890. We distinguished *Beckmann* on the ground that the trailer park was not landlocked "nor was there an urgent necessity for the construction of the second driveway on lands apart from the nonconforming use premises." *Id.* at 198, 262 *A.*2d 890. However, we considered another case controlling:

> The rationale enunciated in *Wolf [v. Zoning Board of Adjustment of Park Ridge,* 79 N.J.Super. 546, 192 A.2d 305 (App.Div.1963)]* is more appropriate to the facts before us. In that case a preexisting restaurant was located on a parcel of land zoned residential. The owner sought to pave a substantial portion of the land to the rear of the restaurant building contending that such lands constituted regular parking grounds. The extension of the nonconforming use onto the previously virgin portion of the lot was challenged as an illegal enlargement of a nonconforming use. This court declared:
>
> > The predominant viewpoint . . . supports the position that *land used as a means of access to,* or for the parking of vehicles of patrons of, a business, *is in a use accessorial* to the business and thus is itself in legal contemplation being used for the business purpose in question. Such use therefore contravenes a zoning ordinance which restricts the parking or access land to residential uses. [*Id.* at 550–51, 192 A.2d 305 (emphasis added).]
>
> [*Id.* at 198–99, 262 A.2d 890.]

Just as Wolf was prohibited from paving to the rear of the restaurant, we held that "[w]e are unpersuaded that plaintiffs should, in contravention of the zoning ordinance, be permitted to expand the use of their trailer park by an accessorial means across their newly acquired lots." *Id.* at 199. *Angel*, like *Beckmann*, does not resolve the issue before us because property in a residential zone is not being used to access commercial property.

The general rule in most jurisdictions is that a passageway leading to a commercial property that crosses a residential property is an accessory use to the commercial property that violates the residential zone restrictions. 7–39 *Zoning and Land Use Controls* § 39.02(2)(b); *Ferris v. Las Vegas,* 96 *Nev.* 912, 620 *P.*2d 864, 865 (1980) ("The use of property in a residential zone to gain vehicular access to business property is a commercial use in violation of zoning laws.") Some states that follow this general rule focus on two issues to determine whether a passageway is an improper accessory use: Is it an essential part of the forbidden use? If so, does it present a threat to the permitted use?

First, the passage must be essential to the business. For example, the New York Court of Appeals held that a commercial parking garage could not extend its driveway across a property in a residential zone. *Yonkers v. Rentways, Inc.,* 304 *N.Y.* 499, 109 *N.E.*2d 597, 598 (1952). The reason was that "the day in, day out moving of vehicles across private land from a public street to the shelter of a garage building is part of the business of garaging vehicles." *Ibid.* Because using the driveway was an essential part of the business, it violated the residential zone. *See also San Francisco v. Safeway Stores, Inc.,* 150 *Cal.App.*2d 327, 310 *P.*2d 68, 71–72 (1957) (holding that the store's parking lot could not be located on property in a residential zone because the parking lot was an "essential and integral" part of the business); *City of Providence v. First Nat'l Stores,* 100 *R.I.* 14, 210 *A.*2d 656, 659 (1965) ("[T]he use of land in a residence district as a means of ingress and egress to land or buildings in a commercial zone for commercial purposes constitutes a commercial use in violation of

zoning restrictions in a residence district."). The principle has also applied to uses that are tied to impermissible residential dwellings. *Richardson v. Zoning Bd. of Appeals*, 351 *Mass.* 375, 221 *N.E.*2d 396 (1966) (forbidding an access road leading from a residential zone to an apartment building when apartment buildings were forbidden in the residential zone).

Second, the nonconforming use must threaten the permitted use. The Supreme Court of Pennsylvania in *Atria, Inc. v. Mount Lebanon Township Board of Adjustment*, 438 *Pa.* 317, 264 *A.*2d 609, 612 (1970), determined that a driveway located on property in a residential zone leading to a commercial parking lot was an impermissible accessory use because it was more advantageous to commercial than residential use and "[i]t could also be expected to alter the character of the district." The court distinguished its holding from one that the Pennsylvania Superior Court had reached in *Prospect Park Borough v. McClaskey*, 151 *Pa.Super.* 467, 30 *A.*2d 179 (1943). In that case the court approved of a driveway between a commercial and industrial zone because "hauling supplies and finished products" would not "alter the character of the district within which it was located." *Id.* at 471, 30 *A.*2d 179. The court pointed out that the presence of commercial traffic in an industrial zone is less likely to change the character of the district than it would in a residential zone. *Ibid.* Thus, a driveway violates the zoning restrictions when it invites traffic that would disturb the character of the zone that the regulation was intended to protect. *Sprint Spectrum, L.P. v. Zoning Hearing Bd.*, 823 *A.*2d 258, 262 (Pa.Commw.Ct.) (approving a driveway passing through a residential zone to a communications tower because its infrequent use "will not change the character of the residential district" and is less intrusive than uses already permitted on the land), *appeal denied*, 576 *Pa.* 728, 841 *A.*2d 534 (2003). However, the Court of Appeals of Maryland found that zoning restrictions were not relevant when evaluating a road built across two zones that was ancillary to uses permitted in both zones. *People's Counsel for Balt. County v. Surina*, 400 *Md.* 662, 929 *A.*2d 899, 923 (2007) ("[W]e find nothing ... which indicates that,

when a split-zoned property, in which both portions are under common ownership when developed, is to contain infrastructure improvements ancillary to permitted uses consistently allowed in both zones, the relative infrastructure must be located entirely within the more densely-developed zone.")

There is no strictly residential property here which is being used to access a commercial property. Rather, the cross-zone driveways provide access for M–1 users to the PD zone. But those driveways are not essential to the residences, supermarket and department store in the PD zone because that zone has multiple points of access from public streets. Additionally, the nonconforming use of M–1 driveways to access the PD zone does not in any way threaten the permitted uses in the M–1 zone. As a consequence, we are satisfied that the Zoning Board erred in concluding otherwise, as did the trial judge. Mountain Hill's amended second as-of-right Application for Development Permit should not have been denied based on the interzone driveways contained in the plans.

## VII.

Mountain Hill next argues that the judge erred in concluding that a building straddling a zone line could not have uses divided within the building by zone line because nothing in the MLUL or the Development Regulations prohibited such a building. More specifically, Buildings G and H straddle the zone line. Building G is designated for residential and retail uses in the PD-zone side of the building and office and retail uses in the M–1–zone side of the building. In Building H the uses on both sides of the zone are retail. Preiss testified that all of the requirements of the Development Regulations were satisfied with respect to the portions of the buildings in each zone. He opined that there was no need for a(c) or (d) variance.

In explaining the denial of the Development Permit in relation to these two buildings, the Township Attorney opined that a(d) variance was required for Building G for the unpermitted residen-

tial use and structure in the M–1 zone, relying on *Stop & Shop Supermarket Co. v. Board of Adjustment, Township of Springfield,* 162 *N.J.* 418, 744 *A.*2d 1169 (2000), *Angel, supra,* 109 *N.J.Super.* 194, 262 *A.*2d 890, and *Suesserman v. Newark Board of Adjustment,* 61 *N.J.Super.* 28, 30, 160 *A.*2d 143 (App.Div.1960), *certif. denied,* 38 *N.J.* 183, 183 *A.*2d 88 (1962). The Zoning Board then required a(d) variance and the judge affirmed that ruling.

None of these cases deal with a building straddling a zone line, nor have we found any such case in this or any of our sister states. However, we are satisfied that our analysis in *Angel* guides the resolution of this issue. Building G as a whole contains uses that are not permitted in the M–1 zone. The portion of Building G in the M–1 zone becomes accessory to the uses in the portion of Building G in the PD zone and the parking lots that provide parking for the M–1 portion of Building G become accessory to the uses in the PD portion of Building G. This design clearly requires a(d) variance for the portion of the building that is located in the M–1 zone even though neither the MLUL nor the Development Regulations anticipated the possibility of a cross-zone building. Indeed, in the amended second as-of-right plan the offending uses in Building G were eliminated. There is no requirement for a variance with respect to Building H. Although the building crosses the zone line, the uses to which it will be put are permitted in both zones. Accordingly, Mountain Hill's amended second as-of-right Application for Development Permit should not have been denied based on the conforming cross-zone buildings.

## VIII.

 The Zoning Board cross-appeals from the judge's conclusion that a consolidation subdivision with the resulting lot being split zoned was not prohibited. It argues that Mountain Hill did not file a consolidation subdivision plan, but that argument is in error. Mountain Hill did file such a plan and the zoning officer was required to refer that plan to the Planning Board. *N.J.S.A.* 40:55D–37(b). The Zoning Board should have addressed this

error and it failed to do so. The judge was entirely correct in his ruling. The amended second as-of-right Application for Development Permit should not have been denied on the ground that a consolidation subdivision is not permitted where the property is split zoned because there is no legal impediment to a single split-zoned lot.

Reversed in part and affirmed in part and remanded to the Planning Board for consideration of the January 3, 2003, Application for Development Permit or the August 27, 2003, Application for a Development Permit, as Mountain Hill shall elect. We do not retain jurisdiction.