**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2915-22

ERIC WOKAS,

     Plaintiff-Appellant,

v.

CHRISTOPHER MATTINA,
ROSEMARIE MATTINA,
BOROUGH OF HIGHLANDS
LAND USE BOARD, DARREN
KAPLAN, and MARISSA
KAPLAN, h/w,

     Defendants-Respondents.

_____

Argued April 24, 2024 — Decided January 7, 2025

Before Judges Gummer and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-1016-22.

Daniel J. O'Hern, Jr. argued the cause for appellant (Byrnes, O'Hern & Heugle, LLC, attorneys; Daniel J. O'Hern, Jr., on the briefs).

Thomas J. Hirsch argued the cause for respondents Christopher Mattina, Rosemarie Mattina, Darren Kaplan, and Marissa Kaplan.

Ronald D. Cucchiaro argued the cause for respondent Borough of Highlands Land Use Board (Weiner Law Group, LLP, attorneys; Ronald D. Cucchiaro, of counsel and on the brief; Richard Brigliadoro and Steven R. Tombalakian, on the brief).

The opinion of the court was delivered by

WALCOTT-HENDERSON, J.S.C. (temporarily assigned).

Plaintiff Erik Wokas appeals from an April 17, 2023 Law Division judgment affirming the decision of defendant the Borough of Highlands Land Use Board (the Board), granting the application of defendants Christopher and Rosemarie Mattina (the Mattinas)[1] for a minor subdivision with ancillary variances and design waivers under the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163. In the application the Mattinas proposed to reconfigure two previously subdivided lots located in the Borough of Highlands into two newly configured lots and sought other variance relief — specifically (c) type variances — to construct on one of the lots a single-family dwelling with a driveway to be built up a steep slope and over an easement located on the

---

[1] When referring to the Mattinas individually, we use their first names for clarity because they share a last name. In doing so, we mean no disrespect.

other lot. Plaintiff contends the court erred by affirming the Board's decision and dismissing with prejudice his complaint in lieu of prerogative writs. We affirm.

I.

The Mattinas own property located at 149 Portland Road (the Property), known as Block 12, Lots 4.01 and 4.02. Plaintiff owns property adjacent to the Mattinas's property, known as Block 12, Lot 5. The Property is within the R-1.03 single family residential zone, was originally designated as Lot 4, and was subdivided into two lots, Lots 4.01 and 4.02, in 1992. The Mattinas bought both lots in 2020 and planned to rent out the house on Lot 4.01 and sell Lot 4.02 to defendants Darren and Marissa Kaplan (the Kaplans), who wanted to build a single-family home on Lot 4.02.

Because of the proposed design, the house to be built on Lot 4.02 would be landlocked on a steep incline with no frontage on a street. To access the proposed home on Lot 4.02, the Mattinas proposed a zig-zagging access driveway over an easement on Lot 4.01. The construction of the driveway, however, would result in a substantial steep slope disturbance in violation of a local ordinance.

3

In October 2022, the Mattinas applied to the Board to create a minor subdivision to modify the existing lot lines of Lots 4.01 and 4.02. As proposed Lot 4.01 would become slightly smaller and contain 10,058 square feet with frontage along Portland Road, while Lot 4.02 would contain 27,850 square feet and lose its frontage on Portland Road. To construct the access driveway, the Mattinas also sought variance relief from the Board. The Mattinas argue that without variance relief from the Board, "Lot 4.02 will be zoned into inutility."

The variances requested for Lot 4.01 related to the dimensions of the property, lot disturbance, and the slope. The variances for Lot 4.02 related to the dimensions of the property and lot disturbance. Lot 4.01 already had an access easement over Lot 3.01, which is also owned by the Mattinas.

In 2009, after Lot 4.01 and 4.02 had been created, the Borough of Highlands adopted a steep slope ordinance requiring a slope area permit for any significant work, such as building a house or driveway, that would disturb a slope of ten percent or more. See Highlands, N.J., Code § 21-84B (2009) (amended 2022).

On January 22, 2022, notice of the public hearing on the Mattinas's application for variance relief was published in the Asbury Park Press, more than ten days before the public hearing, stating "[a]pplicant proposes to

subdivide two existing lots in Block 12 into two new lots which are referred to as proposed Lot 4.01 and proposed Lot 4.02." The variances requested for the proposed lots were separately listed. The record also reflects that on this same date, a representative of the Mattinas filed an affidavit attesting to the fact that notice had been served upon property owners within 200 feet of the "affected property."

On February 10, 2022, the Board held a public hearing during which several witnesses testified, including: Christopher; Keith Cahill, the Mattinas's project engineer and expert witness; Jason Hanrahan, the lead project designer; and several members of the public. Plaintiff did not offer any testimony during this hearing.

Testimony of Christopher Mattina

Christopher testified that before purchasing the property he was aware that Lot 4 consisted of two separate lots and that Lot 4.01 had a vacant house on the Property. He also testified about his plan to rent the building on Lot 4.01 and sell the vacant Lot 4.02 to the Kaplans, who would build a house on the lot. He recounted that he had become aware of the steep slope ordinance during the process of finding a buyer for Lot 4.02.

Testimony of Keith Cahill

Cahill testified about the need for and proposed design of the driveway that would zig-zag from north to south up to the proposed building on Lot 4.02. He concluded that while the proposed zig-zagged property line would result in Lot 4.02 having no frontage, "the legal agreements between the current property owner and the future property owner [would] allows access" via the proposed driveway.

He described the difficulties in planning a driveway for Lot 4.02 and explained that "we can't create a driveway straight up that hill [because] it would be approximately [thirty-five] percent slope straight up. We can't . . . construct something like that. So[,] we have to do [a]. . . kind of a zig-zag." Cahill further explained the original 1992 subdivision occurred before the steep slope ordinance was created. He testified that he had considered the accessibility of each lot, the maintenance of property lines, and the landscaping of both properties and concluded the suggested easement arrangement was the most practical option.

Cahill further testified that he had considered other options, such as using the access easement Lot 4.01 had on Lot 3 or adjusting the location of the house on Lot 4.02 but did not find these to be viable options. The proposed subdivision was, in his opinion, the best option to "preserve more land, cut down less trees,

6

[and] try to comply with [the Borough's] steep slope ordinance." Cahill recognized the challenges the property owner would have when navigating the zig-zag driveway but testified the proposal is "a cost[-]effective solution" that would "minimize the overall impact [on] the land." He testified the driveway would include a retaining wall and be split into a south and north side. The north side, which would include the driveway and grass area, would be maintained by the owners of Lot 4.02, while the south side would be maintained by Lot 4.01. He also assured the Board that:

> I, as the one who has to sign and seal this plan on the bottom right-hand corner, am comfortable that the design is safe. Yes, it's steep. Yes, it has turns. But I'm not concerned about that. It's an element that every property owner along Portland Road has to deal with, and has.
>
> And I think now with your ordinances and the design criteria and being under today's standards, it will be done in a much safer and controlled manner than what you may have in the past, or houses that were built years ago before the regulations that were in place. So that's the obligation of the engineers and the professionals to come up with a safe design. And that's what we'll do.

Cahill also compared the proposed plan to Lot 5, which is owned by plaintiff, and noted the similar "tightness of the road, utilities along the front, and their driveways and slope and the challenge that they've encountered." He noted "they also have that same driveway that jumps up. And when you see our

7

design, we're just mirroring it." He noted two other nearby residential properties that have similar slope and grade challenges and concluded that the proposal would be "similar in aesthetics."

Apart from the steep slope issue, Cahill also addressed the environmental concerns, including erosion and storm-water runoff. He testified that the Mattinas needed to get permits "to show that [they were] not going to create a problem." He also testified storm water could be controlled through "porous pavement on the patios" to return water to the ground and prevent "sliding and things of that nature" and told the Board he was working with the Borough engineer to ensure appropriate water collection and discharge to prevent or minimize erosion and that he had proposed using underground pipes and a discharge point at the bottom of the slope with a sump pump.

Testimony of Jason Hanrahan

Hanrahan is the owner of Mode Architects, the company that prepared the architectural drawings for the proposed home on Lot 4.02. Hanrahan described the proposed home as an approximately 4,000 square foot building with a lower level that, due to the slope of the hill, would be mostly below ground with access in the front.

Public Comment

8

Several neighbors testified in opposition to the Mattinas's application, expressing concern about storm-water management, erosion and drainage. One individual noted that over the forty-five years she had lived across from the Property, she had to put in twenty-two inlets in her own property because "the velocity and volume of water that is running down [her] driveway into the river is unbelievable." Other neighbors testified about the impact the proposed construction would have on the character of the neighborhood, including that: the driveway "is going to be a blind exit onto the street and that is problematic"; Lot 4.01 was created as a flag lot "to have an address that fronted on Portland Road, not to create an entrance to the property"; and the proposal would create an undersized lot.

The Board's Decision

On March 10, 2022, the Board issued a resolution granting the application for the minor subdivision and ancillary bulk relief requested. The Board found the Mattinas had satisfied the criteria needed to grant variance relief and that the denial of that relief "would result in an undevelopable lot which is a taking which would require the Borough to purchase the property . . . ." The Board moved on to examine the positive and negative criteria for the resolution, finding both criteria satisfied. See Price v. Himeji, LLC, 214 N.J. 263, 285 (2013) ("We

have explained that the MLUL 'requires an applicant to prove both positive and negative criteria to obtain a use variance.'") (quoting Smart SMR of N.Y., Inc. v. Fair Lawn Bd. of Adjustment, 152 N.J. 309, 323 (1998)).

The Board imposed conditions, including "strict compliance with . . . the plans and drawings" submitted, as well as any recommendations contained in the Board's professionals' reports, the submission of an access easement and maintenance agreement for the Board's review, "Plot Plan" approval, and payment of all applicable fees.

Plaintiff filed a complaint in lieu of prerogative writs against the Mattinas, the Board, and the Kaplans on April 12, 2022, challenging the Board's ruling, arguing the Board failed to articulate the proofs for the (c)(1) and (c)(2) variances granted and to properly address the negative and positive criteria for the requested variances and the Board granted the variance relief only because it believed to do otherwise would constitute a taking. Plaintiff also alleged that the Mattinas failed to present adequate proofs of the positive and negative criteria, to establish a hardship, and to "produce competent and reliable evidence to demonstrate that the granting of the approval would not create a substantial detriment to [p]laintiff and the public good." Further, plaintiff alleged defendants' public notice failed to properly describe "the nature of the matter to

be considered" and was therefore legally deficient and that, as a consequence, the Board lacked jurisdiction to hear that part of the application and thus its approval is a "nullity." Plaintiff also alleged the Board did not have jurisdiction to consider the Mattinas's application as a (d)(1) variance because the proposed driveway serving Lot 4.02 constitutes a second principal use on Lot 4.01, and having two principal uses requires a (d) variance.

The Decision of the Trial Court

After hearing argument, the court issued a comprehensive and well-reasoned oral opinion. The court acknowledged that the Property had been previously approved as a minor subdivision in 1992 and that the zoning requirements were subsequently amended in 2009. The court noted the Mattinas's proposed minor subdivision of the property would create two new lots: one with a new two-story single-family dwelling ~~on the single-family dwelling~~ on Lot 4.02 and that in addition to seeking approval for the minor subdivision under the MLUL defendant also sought various "(c)" variance relief.

Reviewing the Board's decision, the court noted that decisions on land-use applications are entrusted to the sound discretion of Board because of the Board's particular knowledge of local conditions and determined that the Board's factual findings were entitled to substantial deference. The court addressed the

11

positive and negative criteria as discussed by the Board and concluded that with regard to the merits of the application, plaintiff had the burden to demonstrate that the Board's decision was arbitrary, capricious or unreasonable and that plaintiff did not meet that standard.

The court disagreed with plaintiff on whether the proposed access driveway was a principal use requiring a (d)(1) use variance. Plaintiff argued such a driveway was an impermissible second principal use because permitted and principal uses do not include driveways meant to service other lots. The court concluded the "access drive in this matter is obviously customary and incidental to a single-family home. The approval does not exclude the owners and residents of [L]ot 4.02 from using the drive as well." The court considered the plain meaning of the ordinance and stated "the definition of accessory states that such a structure is generally located on the same lot with same such principal building or use," which is the case with the driveway at issue. The court concluded that there was substantial evidence in the record to support the grant of the variance relief and the application as sought by defendants.

Regarding plaintiff's argument that the Mattinas's notice of the public hearing to neighboring property owners was deficient, the court concluded that the public notice advised members of the public generally of the application.

The court also concluded that no further notice was necessary to property owners within 200 feet of Lot 3.01 because the application did not implicate Lot 3.01 and property owners residing within 200 feet of that lot.

## II.

Plaintiff appeals, arguing: the court erred in ruling the proposed driveway on Lot 4.01 was not a principal use requiring a (d)(1) variance; the Mattinas were not required to provide an application or public notice for a permit pursuant to N.J.S.A. 40D:55D-35 and 40:55D-36; notice was not required for property owners located within 200 feet of Lot 3.01; the Mattinas had satisfied the criteria for the grant of (c)(1) and (c)(2) variances; and the Board's approval "was not based upon the fact that the Board's attorney advised the Board that the denial of the application would result in a compensable taking."

## III.

We note that a local land use board's factual findings are entitled to substantial deference and presumed to be valid because the local board has "peculiar knowledge of local conditions." Grubbs v. Slothower, 389 N.J. Super. 377, 382 (2007) (quoting Burbridge v. Mine Hill Twp., 117 N.J. 376, 385 (1990)).

However, a board's conclusion of law is subject to de novo review. Grubbs, 389 N.J. Super. at 383 (citing Wyzykowski v. Rizas, 132 N.J. 509, 518 (1993); Adams v. DelMonte, 309 N.J. Super 572, 583 (App. Div. 1998)). Even under de novo review, however, a reviewing court must "recognize the board's knowledge of local circumstances and accord deference to its interpretation." Fallone Props., LLC v. Bethlehem Twp. Planning Bd., 369 N.J. Super. 552, 562 (App. Div. 2004). The question of whether a variance is needed at all is "purely a question of law" and therefore subject to de novo review. Nuckel v. Borough of Little Ferry Planning Bd., 208 N.J. 95, 102 (2011) (quoting Fallone Props, 369 N.J. Super. at 561).

"[T]he meaning of an ordinance's language is a question of law that we review de novo." Bubis v. Kassin, 184 N.J. 612, 627 (2005). "When reviewing a trial court's decision regarding the validity of a local board's determination, 'we are bound by the same standards as was the trial court.'" Jacoby v. Zoning Bd. of Adjustment of Borough of Englewood Cliffs, 442 N.J. Super. 450, 462 (App. Div. 2015) (quoting Fallone Props., LLC v. Bethlehem Twp. Plan. Bd., 369 N.J. Super. 552, 562 (App. Div. 2004)).

This issue of whether notice of a public hearing was sufficient is a question of fact and is subject to the arbitrary-and-capricious standard. Davidow

14

v. Bd. of Adjustment, 123 N.J. Super. 162, 166 (App. Div. 1973). However, the question of whether notice was required is a question of law and should be reviewed de novo. Grubbs, 389 N.J. Super. at 383.

A.

Plaintiff contends the court erred in ruling that the proposed access driveway "was not a second impermissible principal use on the existing Lot 4.01." Plaintiff argues that the proposed access driveway solely serving Lot 4.02 located on Lot 4.01 required a (d)(1) use variance because the proposed driveway is an impermissible second principal use on proposed Lot 4.01.

Plaintiff cites to Nuckel, 208 N.J. at 104, where our Supreme Court addressed whether a developer who proposed to merge several existing lots to construct a hotel and place a driveway, with access to a nearby highway, across a different, undersized lot that housed an auto-body shop, was required to obtain variances under the MLUL. Id. at 97-98. There, the Court noted that the local land use code defined an accessory use as one which is "customarily incidental and subordinate to the principal use of a lot or building and which is located on the same lot." Id. at 98. The Court reasoned that the language in the code meant the driveway could be characterized as a new principal hotel use, not an accessory use since it was on a different lot, and because that lot already had a

15

A-2915-22

principal use, an auto-body repair shop, this second principal use required a (d)(1) variance. Id. at 105. The Mattinas challenge plaintiff's reliance on Nuckel, arguing that the facts in that case are "very different than the facts related to the minor subdivision that was approved by the Board" in this case.

Section 21-8 of the Highlands Code defines "accessory" as:

> a building, structure or use which is clearly incidental or subordinate to the principal building or use and generally located on the same lot with such principal building or use. Any accessory building attached to a principal building is deemed to be a part of such principal building in applying the bulk regulations to such accessory building.
>
> [Highlands, N.J., Code § 21-8 (emphasis added).]

The Mattinas argue the plain language of the ordinance supports their proposition that the accessory use is not required to be confined to the same lot as the principal use, pointing to the use of the term "generally." We agree that in interpreting the plain meaning of the ordinance, the term "generally" in the accessory definition modifies "located on the same lot," and thus, the accessory use does not strictly need to be on the same lot. Courts must interpret the words in statutes and regulations "according to their plain meaning." Commc'ns Workers of Am. v. McCormac, 417 N.J. Super. 412, 426 (Law Div. 2008), aff'd, 417 N.J Super. 341 (App. Div. 2010). When given its plain meaning, it is clear

an accessory in the Highlands Code § 21-8 is generally, but not necessarily, located on the same lot as its principal building to which it is an accessory. We further agree with the court that the Borough of Highlands's Code permits accessory structures or uses to be "generally located on the same lot with such principal building or use" unlike in Nuckel where the local ordinance explicitly defined an accessory use as one "which is located on the same lot." Nuckel, 208 N.J. at 98.

We are further persuaded that the zig-zagging driveway is an accessory use by our review of the Highlands Zoning Code § 21-85(C), which provides that permitted principal uses include "single family dwellings, occupied by one (1) family" and permitted accessory uses include "other accessory uses and structures incidental to the permitted principal uses." Highlands, N.J., Code § 21-85(C). Because "accessory" is defined as a "structure or use which is clearly incidental or subordinate to the principal building or use," we conclude the driveway as proposed by defendants constitutes an accessory under Highlands, N.J. Code § 21-8. Although driveways are not expressly named as permitted accessory uses in the Code, "driveways are so ineluctably incidental to any main structure and so customary for all structures that they are permitted accessory

17

structures and uses in every zone." Mountain Hill, L.L.C. v. Zoning Bd. of Adjustment of Middletown, 403 N.J. Super. 210, 243 (App. Div. 2008).

Based on the plain language of the Code and our review of applicable case law, we agree that the proposed driveway constitutes an "accessory" use because it is clearly intended to be incidental or subordinate to the principal buildings, the home on Lots 4.01 and the proposed home on Lot 4.02.

B.

Plaintiff next argues the court erred in holding that defendant was not required to provide an application or public notice for a permit pursuant to N.J.S.A. 40D:55D-35 and 40:55D-36, referring to plaintiff's purported failure to obtain a "planning variance." More particularly, plaintiff states the Mattinas's application did not mention that proposed Lot 4.02 would have no frontage on a municipal street and that its access would be limited to a steep drive on an easement located on Lot 4.01. Plaintiff contends there was no "application for the permit as required by N.J.S.A. 40:55D-35 and 36, for a proposed Lot 4.02 without frontage on a municipal street."[2] Relying on Northgate Condominium Association v. Borough of Hillsdale Planning Board, 214 N.J. 120 (2013),

---

[2] N.J.S.A. 40:55D-35 provides, "[n]o permit for the erection of any building or structure shall be issued unless the lot abuts a street giving access to such proposed building or structure." N.J.S.A. 40:55D-36 addresses appeals.

plaintiff maintains that because the public notice failed to include that information, the Board's approval of the application is a "nullity" because "it is well settled that proper public notice is jurisdictional; and if the notice is not sufficient any action taken by the Board is a nullity." The Court in Northgate Condominium Association states "[i]t is a fundamental principal of law that significant land use decisions require public hearings and that hearings require prior public notice." Id. at 137-38. "Failure to provide adequate notice, or proceeding upon defective notice, deprives a land use board of the power to take any official action and renders null and void any decisions it had made." Id. at 138.

In response, the Mattinas dispute that there was a need for notice of a planning variance and a construction permit because the proposed design on the minor subdivision "was going to change frontage for the existing 4.02 flag lot from ownership to an easement," by agreement between the Mattinas and the Kaplans. The Mattinas further argue that "[t]he subject application now involved the entire tract to create a new subdivision and, therefore, create new lots as new lot lines would now be established." The Mattinas contend that their notice "spells out in explicit detail the facts that a minor subdivision was sought for the two existing lots, i.e. Lots 4.01 and 4.02 that would still result in two lots

and require several variances concerning setbacks and access to [L]ot 4.02 related to the Steep Slope Ordinance." They maintain that notice does not have to be so specific as to outline every design issue related to the subdivision or site plan but simply must give the public a fair idea of how the property is going to be utilized and that their notice accomplished that purpose.

The Board agreed with the Mattinas, concluding that "[o]bviously, the [Mattinas] . . . did not apply for a construction permit . . . because the proposed design of the minor subdivision it approved was going to change frontage for the existing 4.02 flag lot from ownership to an easement."

The court found N.J.S.A. 40:55D-12 did not require notice for a planning variance. The court further concluded the notice that was submitted by the Mattinas advised the public sufficiently and described the "substantial impacts that the project would have on the community" and of the "general nature of the application."

The issue of whether notice was sufficient is a question of fact and is subject to the arbitrary-and-capricious standard. Davidow, 123 N.J. Super. at 166. Under the Borough of Highlands's Code, notice of a hearing must be given to "owners of all real property, as shown on the current tax duplicate, located in the State and within two hundred (200) feet in all directions of the property

which is the subject of such hearing."  Highlands, N.J., Code § 21-11(B)(1)(b).

Similarly, N.J.S.A. 40:55D-12(b) also requires notice of a public hearing be

given to property owners "within 200 feet in all direction of the property which

is the subject of such hearing" and must:

> state the date, time and place of the hearing, the nature of the matters to be considered and . . . an identification of property proposed for development by street address, if any, or by reference to lot and block numbers as shown on the current tax duplicate in the municipal tax assessor's office, and the location and times at which any maps and documents for which approval is sought are available . . . .
>
> [N.J.S.A. 40:55D-11.]

The purpose of providing such notice is to

> ensure that members of the general public who may be affected by the nature and character of the proposed development are fairly apprised thereof so that they may make an informed determination as to whether they should participate in the hearing or, at the least, look more closely at the plans and other documents on file.
>
> [Perlmart of Lacey, Inc v. Lacey Twp. Planning Bd., 295 N.J. Super. 234, 237-38 (App. Div. 1996).]

"The critical element of such notice has consistently been found to be an

accurate description of what the property will be used for under the application."

Id. at 238.  In Perlmart, the plaintiff's notice failed to advise the public that the

proposed use of the property would be to open a K-Mart shopping center and, without this information, the court was not convinced "the general public understood the nature of the application." Id. at 240. In that case, because the notice was deficient, "the Planning Board lacked jurisdiction to consider the application." Id. at 241.

Here, the Mattinas stated in their application that they sought in their application "a better zoning alternative so the lots previously approved by the subdivision [could] be developed in a new configuration" to accommodate the proposed home on Lot 4.02. The notice also gave the date, time, and location of the Board's public meeting and invited any person affected by the application to attend the meeting and be heard. Although the notice did not specify the subdivision sought to make Lot 4.02 more developable for residential use, the Lot is in a residential zone and would, therefore, presumably be used for residential purposes absent a clear indication otherwise. Moreover, the notice stated that "all documents relating to this application may be inspected by the public" and gave the location and times that these documents would be available. The attachments to the application, which are part of the record before us, include the plats and architectural plans showing the proposed house to be built on the new Lot 4.02 and the driveway.

Plaintiff faults the Mattinas because they did not "enumerate the need for a permit in the notice pursuant to N.J.S.A. 40:55D-36," but that need did not exist because a lot without frontage did not exist prior to the Board's approval of the reconfigured subdivision. N.J.S.A. 40:55D-35 provides that "[n]o permit for the erection of any building or structure shall be issued unless the lot abuts a street giving access to such proposed building or structure." However, the "power to grant relief from street improvement requirements . . . is limited to existing lots for which building permits have been applied and does not extend to lots yet to be created as a result of subdivision approval." Amato v. Randolph Twp. Planning Bd., 188 N.J. Super. 439, 449 (App. Div. 1982). Thus, "there was no basis" for the Board to grant relief "for a not yet extant rear lot which was to be created as a result of the proposed subdivision." Ibid. Plaintiff's argument was therefore premature. Although the Mattinas would need to apply for a permit once the reconfigured subdivision was approved, they could not yet apply for a permit under N.J.S.A. 40:55D-36, and the Board could not grant a permit to do so. Ibid.

We reject plaintiff's arguments about the notice and find no cause to disagree with the court's finding that the Mattinas's notice to property owners "within 200 feet in all direction of the property which is the subject of such

23                                                    A-2915-22

hearing" was sufficient. Specifically, we note the statute requires notice of public hearings to all properties within 200 feet of the proposed new boundaries identified by "common names or other identifiable landmarks," and by lot and block number. N.J.S.A. 40:55D-62.1. And, we are satisfied, the Mattinas provided notice of the reconfigured subdivision to property owners within 200 feet of Lots 4.01 and 4.02 as required by the Highlands Code and N.J.S.A. 40:55D-62.1.

Plaintiff next argues the court erred in holding that the subject application did not implicate Lot 3.01 and that notice was required to the property owners within 200 feet of that Lot. The Mattinas and Kaplans dispute the need for notice to be served on properties within 200 feet of Lot 3.01, arguing "the subject application had absolutely nothing to do with Lot 3.01 or the easement between Lot 3.01 and Lot 4.01." They contend that the easement already established vested rights that could not be changed by the Board and could be changed only by the property owners' agreement and that "the access over [Lot] 3.01 to [Lot] 4.01 was not changing in any manner, and there were no changes on lot 4.01 that would in any way intensify or change the use of that easement area"; thus, the notice as provided was legally sufficient.

The court agreed with the Mattinas that the reconfiguration of Lots 4.01 and 4.02 "did not implicate Lot 3.01 and property owners residing within 200 feet of that Lot, which has no nexus to this application, did not require notice."

Plaintiff relies on Brower Development Corp. v. Planning Board of the Township of Clinton, in which we held a common-sense interpretation of the applicable code "dictates that the lots traversed by the [proposed] roadway become part of the property which was the subject of the Board's hearing." 255 N.J. Super. 262, 270 (App. Div. 1992). The roadway in question in Brower would have been built over a newly acquired lot and through an easement, and so nearby property owners "would be significantly affected by its construction and should have been afforded notice of the Board's hearing." Ibid.

Here, however, the easement and driveway on Lot 3.01 predate the proposal and are unaffected by it. Under N.J.S.A. 40:55D-12(b), notice of a hearing should be given to property owners "within 200 feet in all directions of the property which is the subject of such hearing." Lot 3.01 was not the subject of the hearing because it would not be affected by the proposed subdivision or variances. It would continue to exist as it had for decades. Because providing notice serves to ensure the general public affected by a proposed development are given the opportunity to oppose the change, Perlmart, 295 N.J. Super. at 237-

38, where there was no change, there was no need for notice to property owners within 200 feet of Lot 3.01.

Based on our de novo review, we agree that notice to the property owners within 200 feet of Lot 3.01 was not required because the record is devoid of any evidence the Mattinas's application would change the intensity or use of the easement area between Lots 3.01 and 4.01. Grubbs, 389 N.J. Super. at 383.

C.

Plaintiff next argues the Mattinas presented no credible proofs to the Board that the grant of the application, which included a substantial deviation from the steep slope ordinance, advanced any purpose of zoning. Plaintiff maintains that if anything, "the grant of the application contravenes the purposes of zoning under the MLUL specifically the environmental and safety purposes advanced by the sleep steep slope ordinance." And that even though the Mattinas did not present any expert testimony from a professional planner in support of their request for the steep slope variance — (c)(2) variance — the Board found that they "had satisfied the positive criteria pursuant to the 'flexible' statutory standard" and that the proposed subdivision promotes appropriate population densities identified in the Borough Code and also replaces a vacant

lot with an attractive permitted single family home, which promotes a desirable visual environment.

Plaintiff maintains that the Board's findings of positive criteria are not based on any specific proofs in the record that the subdivision as proposed promotes appropriate population densities and a desirable visual environment. Plaintiff also contends the Mattinas failed to satisfy the negative criteria, which requires a demonstration that the variance can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance. N.J.S.A. 40:55D-70. Finally, plaintiff argues that, under Kaufmann v. Planning Board, 110 N.J. 551, 563 (1988), "no [(c)(2)] variance should be granted when merely the purposes of the owner will be advanced."

In addressing these arguments, the Mattinas assert that the Board's decision was not arbitrary, capricious or unreasonable because the Board considered their proposed new layout for the existing lots, particularly with respect to its engineering concerns about water runoff. The Mattinas further maintain that they presented the testimony of an engineer to address the Board's most critical concern, which was preventing water runoff onto adjoining properties and ensuring that water "would all be directed in the same manner as

it was currently directed at a rate that would be acceptable to the Board engineer."

As to plaintiff's arguments that the Board failed to properly address the positive and negative criteria, the Mattinas maintain that the driveway design as proposed and approved shows that there would be no drainage problems or erosion down the slope and further that "as the Board found in its resolution, it was not a good zoning alternative to prevent any development on [L]ot 4.02 which was a legally created lot." Additionally, the Mattinas maintain that the development of Lot 4.02 as a single-family residential lot is permitted by zone and would have no adverse impact on the surrounding properties, and that the Borough has had many fully developed properties on very steep slopes, and the Borough's "technology and engineering" has allowed such development to happen safely. As to the "negative criteria," the Mattinas argue that the Board correctly found there that their proposal would not result in a substantial detriment to surrounding properties or the zoning plan.

The court agreed that "substantial evidence" was presented to the Board to support its grant of variance relief and found that the plaintiff "cannot satisfy [its] high burden of proof to set aside the [B]oard's decision."

The MLUL governs land use and development planning generally and specifically authorizes zoning boards to grant variances under circumstances defined in the statute itself.  N.J.S.A. 40:55D-70(d).  This statute provides, in pertinent part, that the Board may:

> In particular cases for special reasons, grant a variance to allow departure from regulations pursuant to article [eight] of this act to permit . . . a height of a principal structure which exceeds by [ten] feet or [ten percent] the maximum height permitted in the district for a principal structure.
>
> [N.J.S.A. 40:55D-70(d)(6).]

However,

> No variance or other relief may be granted under the terms of this section, including a variance or other relief involving an inherently beneficial use, without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.
>
> [N.J.S.A. 40:55D-70(d).]

To obtain a (d) variance, an applicant must satisfy the positive and negative requirements of N.J.S.A. 40:55D-70(d).  New York SMSA, L.P. v. Bd. of Adjustment of Twp. of Weehawken, 370 N.J. Super. 319, 355 (App. Div. 2004).  The statute's positive criteria require an applicant to show that "special reasons" warrant granting of the variance.  Grasso v. Borough of Spring Lake

Heights, 375 N.J. Super. 41, 51 (App. Div. 2004). To satisfy the positive requirement for a (d)(6) variance, an applicant can show undue hardship, that is, "the property for which the variance is sought cannot reasonably accommodate a structure that conforms to, or only slightly exceeds, the height permitted by the ordinance." Ibid.

To meet the negative requirement of N.J.S.A. 40:55D-70(d), an applicant can demonstrate that the proposed structure will not offend the zoning ordinance's purpose for the height restriction and will "nonetheless be consistent with the surrounding neighborhood." Id. at 53. A zoning board must also "consider the effect of the proposed height variance on the surrounding municipalities affected by the decision." Jacoby v. Zoning Bd. of Adjustment of Borough of Englewood Cliffs, 442 N.J. Super. 450, 466 (2015).

Plaintiff argues the hardship here was self-created in 1992 when the lots were first subdivided, and the original proposed flag lot of Lot 4.02 could not have a useable driveway due to its steepness. The fact that this subdivision occurred before the Mattinas acquired the property is irrelevant, argues plaintiff, citing Cox & Koenig, New Jersey Zoning and Land Use Administration (2022). The Mattinas maintain the hardship was not "self-created" but rather was created by the 2009 ordinance, after the original subdivision of the Property in 1992.

The Board maintains that the expert testimony confirming the Property could not be developed absent variance relief was sufficient to support its grant of that relief. They argue, "[t]he decision of the Board finding that the [Mattinas] had satisfied the negative criteria was neither arbitrary, unreasonable or capricious and is entitled to an enhanced level of deference, as correctly recognized by the trial court when affirming the Board's decision."

A planning board is given the authority to "grant such exceptions from the requirements for site plan approval as may be reasonable and within the general purpose and intent of the provision" when considering such application. N.J.S.A. 40:55D-51(b). However, this relief is available only "if the literal enforcement of one or more provisions of the ordinance is impracticable or will exact undue hardship because of peculiar conditions pertaining to the land in question." Ibid.

A showing of undue hardship can be made by sufficient proof of "(a) exceptional narrowness, shallowness or shape of the property; (b) exceptional topographic conditions or physical features uniquely affecting the property; or (c) an exceptional situation uniquely affecting the property or its lawfully existing structures." Lang v. Zoning Bd. of Adjustment of N. Caldwell, 160 N.J. 41, 52 (1999). "[T]he focus of the board's inquiry should be on whether the

unique property condition relied on by the applicant constitutes the primary reason why the proposed structure does not conform to the ordinance." Id. at 56 (citing Bressman v. Gash, 131 N.J. 517, 521 (1993)).

However, a hardship variance is dependent on how the hardship was created. "If an owner who was entitled to a hardship variance sells to a buyer who is aware of the nonconformity, the buyer does not lose the right to a variance because of that knowledge." Jock v. Zoning Bd. of Adjustment, 184 N.J. 562, 590 (2005) (citing Harrington Glen, Inc. v. Mun. Bd. of Adjustment of Leonia, 52 N.J. 22, 28 (1968)). "Likewise, if the prior owner was not entitled to a hardship variance, that impediment would pass to a buyer, even one who had no hand in creating the hardship." Ibid. (citing Ketcherick v. Borough of Mountain Lakes Bd. of Adjustment, 256 N.J. Super. 647 (App. Div. 1992)).

As previously stated, Lot 4 was subdivided in 1992, and the steep slope ordinance was not adopted until 2009. Under the new ordinance, a slope area permit would be required for any significant work, such as building a house or driveway, that would disturb a slope of ten percent or more. Highlands, N.J., Code § 21-84B.

We discern the adoption of the 2009 ordinance rendered any previous discussions of a driveway moot until the owners of Lots 4.01 and 4.02 were

granted a variance. The Mattinas's application explains why the variance is required "to construct a driveway to Lot 4.02 pursuant to the previously approved subdivision plan, would violate requirements of that ordinance," and that the hardship now faced was "directly related to the topography of the lot and the adoption of the new slope ordinance." The driveway would have to zig-zag but also allow for easy access for owners of both lots, and the solution was the proposed subdivision with the easement over Lot 4.01.

Based on the record, there was ample evidence before the court to find that "requiring strict compliance with the requirements of the [o]rdinance would create practicable difficulty in developing the subject Property with a permitted use." As the Mattinas argue, Lot 4.02 would likely have continued to sit vacant and undeveloped until a variance was granted.

We reject plaintiff's assertion the Board and the court did not consider the steep slope ordinance, which was adopted to prevent environmental damage and to protect the public from natural disasters. This argument is belied by the record, which shows the Board heard the uncontroverted testimony of Cahill regarding his attempts to minimize disturbance to the slope and address environmental concerns, including saving mature trees and managing water runoff. And, we further reject plaintiff's argument the positive criteria were not

met in that the application did not advance any purpose of zoning but in fact "contravenes the purposes of zoning under the MLUL." The Board specifically addressed this issue when it concluded that the benefits of deviation, including promoting an appropriate population density, outweighed any detrimental impact to the public welfare or impairment to the intent and purpose of the ordinance, given that the property was located in a residential zone.

The Board argues its resolution clearly sets forth its findings of fact and conclusions of law and that its decision was not "arbitrary, unreasonable or capricious." Likewise, the Matttinas argue the Board "followed the strict requirements in the [MLUL] in determining the merits of the bulk C variances required," appropriately analyzed the negative and positive criteria, and stated its reasoning in the resolution.

The court agreed with the Board and found substantial evidence in the record supporting its grant of (c)(1) and (c)(2) variance relief. We agree. The court found the proposed subdivision "promotes appropriate population densities identified in the borough code and also replaces a vacant lot with a single-family home." The court further found that the positive criteria substantially outweighed the negative criteria because the grant of variance relief would not "result in additional population density, increased traffic

beyond what is contemplated by the ordinance, increased noise, or noxious odors."

D.

Plaintiff next argues "it is clear that the Board's decision to grant the [a]pplication was heavily influenced by the advice of its attorney that the denial of the [a]pplication could result in a compensable taking."  In support of his argument, plaintiff cites only to cases that purportedly show that zoning regulations that limit development for valid environmental or public safety justification "can only be deemed to required compensation if the regulation denies, 'all economically beneficial or productive use of the land' or otherwise goes 'too far' in interfering with the distinct and reasonable investment . . . ." Plaintiff cites to Gardner v. N.J. Pinelands Commission, 125 N.J. 193, 222 (1991), holding that Pineland regulations limiting the development to one house per twenty-five acres and farming use do not cause a regulatory taking, in support of his argument that the "[d]efendant Mattina retains full use of the combined . . . parcel as it has been used for many years."  Stated differently, plaintiff argues the Mattinas could have combined the two lots for the development of a larger home on the combined lots, "which would have eliminated the majority of the variances and problems presented by the

35

[a]pplication"; therefore, the Mattina defendants "ha[ve] not been deprived all of the economically beneficial or productive use of the Property that would require compensation under the Takings Clause."[3]

The Board and the Mattinas dispute plaintiff's contention. The Mattinas argue that the Board attorney was correct and that denial of the variances "would eliminate all benefits that [Lot 4.02] had or could potentially have but leaving all the burdens intact as a separate lot on the tax map."

The court found that neither the Board nor the Mattinas had "stressed the denial of this application would result in a taking" and that the record was clear that the Board had considered all the variances needed and the pros and cons of granting the requested relief. The court found the Board, in reviewing the application, appropriately and fairly considered the request for variance relief based upon all of the information it had and found "nothing improper with the comments of the professionals and/or the [B]oard members and the suggested

_____

[3] The Takings Clause of the U.S. Constitution, U.S. Const. amend. V., is applicable to New Jersey through the Fourteenth Amendment, and provides that "private property [shall not] be taken for public use, without just compensation." 257-261 20th Ave. Realty, LLC v. Roberto, 477 N.J. Super 339, 361 (App. Div. 2023), (quoting Tyler v. Hennepin Cnty. 598 U.S. 631, 637 (2023) certif. granted, 256 N.J. 535 (2024)).

threat of a taking did not bias the application." The court further found no evidence that the approval was "premised upon a suggested taking."

We agree with the court that the Board properly considered a myriad of issues, including the potential impact of a denial of the Mattinas's application for minor subdivision approval and variance relief and whether "the result of a denial where the lot couldn't be developed or further used could result in a taking," as stated by the Board attorney. However, we reject plaintiff's argument the court erred in holding that the Board's approval was not improperly influenced by the Board's attorney advice that the denial of the Mattinas's application would result in a taking. Plaintiff essentially argues the Board overemphasized and improperly relied on the fact that if the variances were not approved, the municipality would be required to compensate the Mattinas for Lot 4.02. Plaintiff's contention, however, is belied by the record, which as the court concluded, shows that the Board properly considered all of the relevant factors prior to making its decision. The Board heard testimony from the Mattinas' expert, who testified at length regarding the positive and negative criteria and concluded that the application included sufficient evidence to support its finding that both positive and negative criteria were met and that the positive criteria outweighed the negative. Further, the Board imposed

conditions on the Mattinas, including requiring them to seek approval from the Board engineer to ensure compliance with all relevant stormwater management requirements.  Thus, we reject plaintiff's arguments to the contrary.  Davidow, 123 N.J. Super. at 166.

As previously stated, "[t]he judicial role in reviewing a zoning ordinance is tightly circumscribed and the ordinance enjoys a strong presumption in favor of its validity which continues unless overcome by clear showing that it is arbitrary and unreasonable."  Ibid.  The court concluded "[c]onsistent with this deferential authority the Court finds no basis to substitute its judgment for that of the [B]oard, and there was sufficient credible evidence in the record supporting this decision."  Against this backdrop, we discern plaintiff's argument is merely speculative and wholly unsupported by the record.

E.

Finally, the Mattinas assert that plaintiff lacks standing to challenge the validity of the original subdivision that created Lots 4.01 and 4.02 in 1992.  They contend that "[t]o the extent plaintiff's arguments are deemed to be attacking the validity of the 1992 subdivision that created [L]ots 4.01 and 4.02 as separate, distinct and legal lots as shown on the tax map of the Borough of Highlands, plaintiff has no standing to challenge that subdivision."  They also maintain the

timeframe to challenge the Board's action is governed by <u>Rule</u> 4:69-6 and has long since expired. <u>R.</u> 4:69-6 ("No action in lieu of prerogative writs shall be commenced later than [forty-five] days after the accrual of the right to the review . . . ."). The Mattinas also maintain that any challenge by plaintiff is barred by the equitable doctrines of estoppel and laches, citing <u>Frankel v. C. Burwell, Inc.</u>, 94 N.J. Super. 53 (Cnty. Ct. 1967). "Laches is an equitable doctrine, operating as an affirmative defense that precludes relief when there is an 'unexplainable and inexcusable delay' in exercising a right, which results in prejudice to another party." <u>Fox v. Millman</u>, 210 N.J. 401, 417 (2012) (quoting <u>Cnty. of Morris v. Fauver</u>, 153 N.J. 80, 105 (1998)).

Plaintiff, in his reply brief, disputed the Mattinas's contention that the 2009 Steep Slope Ordinance created the hardship, arguing instead that "[t]he adoption of the Steep Slope Ordinance required the need for the variance, but the hardship was created by the 1992 subdivision because without the subdivision no driveway would be required up the steep slope to the upper lot on the subdivided property." Plaintiff further contends that "the hardship on [d]efendant Mattina[s] was self-imposed," by their purchase of the property, and the Board and the court erred in finding that the Mattinas had satisfied the positive criteria under the (c)(1) variance standard.

We reject plaintiff's argument insofar as it is based on challenges to the validity of the original subdivision of Lots 4.01 and 4.02 in 1992.  Plaintiff does not dispute that the lots were created nearly two decades ago and based on the passage of time, we discern any contention that Lots 4.01 and 4.02 were not lawfully created has long ago been abandoned under Rule 4:69-6.  Thus, we agree with the Mattinas that any challenge to the 1992 subdivision of Lots 4.01 and 4.02 is barred by the doctrines of estoppel and laches.

In sum, based on this record, we see no basis to disturb the court's affirmance of the Board's decision granting the Mattinas's application for minor subdivision with ancillary variances and design waivers as to Lots 4.01 and 4.02 was properly supported by the record.  See Fallone Props., LLC v. Bethlehem Twp. Planning Bd., 369 N.J. Super. 552, 562 (App. Div. 2004).  Weighing the positive and negative criteria, we conclude, as did the court, that the substantial evidence in the record supports the board's grant of the variances and design waivers.  See Sica v. Bd. of Adjustment of Wall, 127 N.J. 152, 166 (1992).

To the extent we have not specifically addressed any of plaintiff's arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

40                                                    A-2915-22